UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JOHN DOE, a fictitious name,

                         Petitioner,

                                            1:17-CV-1005
v.                                           (GTS/CFH)

HOWARD ZUCKER, M.D., in his official capacity
as Commissioner of Health of the State of New York,

                         Respondent.
_____

APPEARANCES:                     OF COUNSEL:

O'CONNELL & ARONOWITZ        JEFFREY J. SHERRIN, ESQ.
  Counsel for Petitioner             MICHAEL Y. HAWRYLCHAK, ESQ.
54 State Street, 9th Floor
Albany, NY 12207

CONSTANTINE CANNON LLP       ROBERT LOUIS BEGLEITER, ESQ.
  Counsel for Respondent           GARY MALONE, ESQ.
335 Madison Avenue, 9th Floor      HARRISON McAVOY, ESQ.
New York, NY 10017                MARGAUX POUEYMIROU, ESQ.
                                   MATTHEW J. KOENIG, ESQ.
                                   NOELLE M. YASSO, ESQ.

GLENN T. SUDDABY, United States District Judge

**DECISION and ORDER**

      Currently before the Court, in this action filed by John Doe ("Petitioner") against New

York State Commissioner of Health Dr. Howard Zucker ("Respondent"), are (1) Petitioner's

motion for summary judgment, and (2) Respondent's motion for summary judgment.  (Dkt. Nos.

237, 238.)   For the reasons set forth below, both motions are denied.

**I.**      **RELEVANT BACKGROUND**

      **A.**      **Petitioner's Amended Verified Petition**

Generally, in his Amended Verified Petition, Petitioner asserts four claims: (1) a claim that Respondent has violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, by promulgating regulations ("the Challenged Regulations") of the New York State Department of Health ("DOH") that discriminate against persons with a serious mental illness ("SMI") such as Petitioner by (a) depriving them of their right to choose to live in a transitional adult home ("TAH") solely because of their mental disability, (b) forcing them to accept accommodation in a residence other than the TAH of their choice, and (c) forcing patients in hospitals or nursing homes, or persons in shelters or other unacceptable living situations, to remain in living situations or levels of care that are unsuitable to them (rather than transferring into a TAH), merely because of their mental disability (Petitioner's "First Claim"); (2) a claim that Respondent has violated Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, based on the same discriminatory conduct underlying his First Claim (Petitioner's "Second Claim"); (3) a claim that Respondent has violated the Fair Housing Act ("FHA"), 42 U.S.C. § 3601, *et seq.*, based on the same discriminatory conduct underlying his First Claim (Petitioner's "Third Claim"); and (4) a claim under Article 78 of the N.Y. C.P.L.R. that Respondent has promulgated the Challenged Regulations in a manner that is arbitrary, capricious, and irrational by, among other things, (a) violating the aforementioned federal laws, (b) compelling TAHs to violate the civil rights of persons with a serious mental illness such as Petitioner, (c) categorizing all persons with a mental illness alike without regard to their individual circumstances, (d) lacking scientific, empirical or evidence-based support, and (e) inconsistently defining a serious mental illness (Petitioner's "Fourth Claim"). (Dkt. No. 161 [Am. Verified Petition].)  As relief for his injuries, Petitioner seeks declaratory and injunctive relief.  (*Id*. at 20.)

**B.     Summary of Parties' Arguments on Their Motions for Summary Judgment**

**1.     Petitioner's Motion for Summary Judgment**

**a.     Petitioner's Memorandum of Law in Chief**

Generally, in support of his motion, Petitioner asserts two arguments. (Dkt. No. 237, Attach. 1.) First, Petitioner argues, he is entitled to summary judgment on his Third Claim (under the FHA), because the Challenged Regulations are invalid under the FHA's express preemption provision. (*Id*. at 10-34.) More specifically, Petitioner argues as follows: (a) the State has not met its burden of demonstrating that its facially discriminatory regulations are not invalid under the FHA, because discriminatory State regulations are expressly preempted by the FHA, an otherwise discriminatory law can survive only if it fits within the FHA's statutory exceptions, the FHA provides no support for a freestanding inquiry into whether discriminatory regulations serve a legitimate government interest (which ultimately finds support in an Eighth Circuit case that unjustifiably grafted a Fourteenth Amendment equal-protection claim standard onto an FHA claim); (b) the discrimination required by the Challenged Regulations is not necessary to prevent direct threats to health and safety, because the health and safety exception is narrow and individualized, and there is no evidence that the Challenged Regulations benefit remaining residents with mental illness; (c) the discrimination required by the Challenged Regulations is not benign, because the exception for "benign" discrimination is narrow, the Challenged Regulations are not necessary to comply with the ADA (as interpreted by the Supreme Court in *Olmstead v. L.C. ex rel. Zimring*), and the ADA must be read in harmony with the FHA; and (d) because the Challenged Regulations fail to meet either of the FHA's two narrow exceptions, they are therefore invalid (and it is irrelevant what other governmental

interests might be served by the Challenged Regulations, or how narrowly tailored these regulations might be to the State's ends).  (*Id.*)

Second, Petitioner argues, he is entitled to summary judgment on his Fourth Claim (under Article 78 of the N.Y. C.P.L.R.), because the Challenged Regulations are arbitrary, capricious and irrational.  (*Id.* at 34-42.)  More specifically, Petitioner argues as follows: (a) the State lacks any scientific evidence to support the Challenged Regulations, because, according to Dr. Lloyd Sederer (to whom the State attributes OMH's clinical determination that certain adult homes are clinically inappropriate for persons with serious mental illness), there is no evidence-based study, analysis, or report that reviews how residents who transition from an adult home to supportive housing fare in supportive housing versus the adult home, or that compares outcomes between residents living in an adult home versus those who live in supportive housing; (b) the numerical thresholds in the Challenged Regulations (adult homes having 80 or more beds and a seriously mental ill population of no more than 25 percent) are arbitrary and without rational basis, because they are based on nothing more than Dr. Sederer's "opinion"; (c) the definition of serious mental illness used in the Challenged Regulations is overly broad and discriminatory, because it encompasses 856 different mental disorders (including eating disorders and sexual dysfunction) regardless of whether individuals' treatment (such as medication or psychotherapy) has completely controlled or alleviated their symptoms; and (d) the Challenged Regulations discriminate against people with a serious mental illness who have other needs (such as medication management or assistance with bathing or toileting) by precluding those people from being admitted into an Assisted Living Program (or "ALP") in a TAH (regardless of their medical or physical needs or the recommendations of their treating physicians).  (*Id.*)

4

**b.    Respondent's Opposition Memorandum of Law**

Generally, in response to Petitioner's motion, Respondent asserts two arguments.  (Dkt. No. 243.)  First, Respondent argues, Petitioner is not entitled to summary judgment on his Third Claim (under the FHA), because the Court should apply the accepted legal standard for claims under the FHA, which permits governments to engage in differential treatment that furthers legitimate interests.  (*Id*. at 11-24.)  More specifically, Respondent argues as follows: (a) under the prevailing legal standard, the State is permitted to engage in differential treatment that furthers legitimate governmental interests; (b) Petitioner's proposed legal standard lacks any basis in law, and the Challenged Regulations are narrowly tailored to achieving the State's legitimate governmental interests (as shown by the fact that the Challenged Regulations apply to only eight percent of adult homes in New York State); and (c) promoting integration for persons with disabilities is a legitimate justification under the FHA.  (*Id*.)

Second, Respondent argues, Petitioner is not entitled to summary judgment on his Fourth Claim (under Article 78 of the N.Y. C.P.L.R.), because substantial evidence establishes that the Challenged Regulations are not arbitrary, capricious or irrational.  (*Id*. at 24-35.)  More specifically, Respondent argues as follows: (a) the Challenged Regulations are based on substantial evidence; (b) laws and regulations may properly use quantifiable standards to serve legitimate governmental interests and policy goals; (c) the limitations placed on the TAHs' admission of persons with serious mental illness are reasonable; (d) the Challenged Regulations define "serious mental illness" reasonably and consistently with the legislative scheme; and (e) there is substantial evidence that the Challenged Regulations do not discriminate against persons with serious mental illness who have special needs, and Petitioner has adduced no evidence that

the Challenged Regulations are preventing persons with serious mental illness from being admitted into ALPs.  (*Id*.)

### c.   Petitioner's Reply Memorandum of Law

Generally, in reply to Respondent's response, Petitioner essentially asserts two arguments.  (Dkt. No. 247.)  First, Petitioner argues, the Court should reject Respondent's first argument (regarding Plaintiff's Third Claim) for the following reasons: (a) a state law that permits or requires actions that would violate the FHA is expressly preempted, a point of law recognized by the Tenth Circuit (regardless of whether the state law would survive under the Fourteenth Amendment equal-protection analysis first borrowed in an Eighth Circuit case); and (b) in any event, the Challenged Regulations violate the FHA even under Respondent's incorrect legal standard, because *Olmstead* expanded (not contracted) options for the disabled, while the Challenged Regulations operate solely to eliminate housing options for persons with serious mental illness, and the Settlement Agreement (which is not the subject of this litigation) has been an abject failure.  (*Id*. at 4-12.)

Second, the Court should reject Respondent's second argument (regarding Plaintiff's Fourth Claim) because the Challenged Regulations are arbitrary, capricious and irrational for the following reasons: (a) the Challenged Regulations lack empirical support, because the expert opinions and supposed consensus on which Respondent relies are in turn entirely unsupported by any empirical evidence; (b) the numerical thresholds in the Challenged Regulations (again, adult homes having 80 or more beds and a seriously mental ill population of no more than 25 percent) are arbitrary, not being based on any scientific evidence, published literature, evidence-based support, or even direct observation of a facility exceeding those thresholds; (c) Respondent's

overbroad definition of "serious mental illness" is arbitrary and capricious, because it includes persons whose mental illness is fully controlled such that they experience no present symptoms or functional limitations; and (d) Respondent's failure to consider the needs of persons eligible for ALPs was arbitrary, capricious, and irrational, because Respondent's argument that the Challenged Regulations apply to only eight percent of adult homes in New York State fails to take into account the geographic distribution of ALP beds or whether there are vacancies. (*Id*. at 12-18.)

### 2.   Respondent's Motion for Summary Judgment

#### a.   Respondent's Memorandum of Law in Chief

Generally, in support of his motion, Respondent asserts two arguments. (Dkt. No. 238, Attach. 1.) First, Respondent argues, despite the fact that there were sufficient factual allegations to find that Petitioner had standing for purposes of the motion for judgment on the pleadings, there does not exist admissible record evidence from which a reasonable jury could find that Petitioner had standing for purposes of Defendant's motion for summary judgment. (*Id*. at 13-20.) More specifically, Respondent argues as follows: (a) there exists no admissible record evidence that it is *likely* that Petitioner would seek readmission to a TAH (and thus potentially impacted by the Challenged Regulations) if he were to follow through with his expressed desire to move out of Oceanview; (b) even if such evidence existed, there is no admissible record evidence that there is any *actual or imminent* risk that the Challenged Regulations would bar his readmission to such a facility; and (c) moreover, there is no admissible record evidence that there is any *likelihood* that the Challenged Regulations would bar his readmission to such a facility. (*Id*.)

7

Second, Respondent argues, even if Petitioner had standing, the State would still be entitled to summary judgment, because there are no triable issues of fact that the Challenged Regulations protect individuals with disabilities from discrimination and pass muster under any level of scrutiny (including heightened scrutiny).  (*Id*. at 20-35.)  More specifically, Respondent argues as follows: (a) the Challenged Regulations serve legitimate bona fide governmental interest of fostering integration of individuals with serious mental illness into the community rather than allowing the segregation of such individuals; (b) indeed, in the absence of the Challenged Regulations' restrictions on TAHs' admission of new residents with serious mental illness, the advances that TAHs have achieved in becoming more integrated would be reversed as they revert to being warehouses for individuals with serious mental illness, contrary to the goals of federal disability law; (c) the Challenged Regulations are narrowly tailored to effectuate the legitimate governmental interests (given that they apply to only eight percent of adult homes in New York State, they permit admissions after the adult homes' mental health census falls below 25 percent, they contain a waiver procedure for individuals who have previously lived in a TAH and wish to move back into such a facility, and there are no less-discriminatory alternatives to the Regulations to serve the State's interests); and (d) the Challenged Regulations are based on clinical evidence, further the goal of the ADA's integration mandate, are within the state's authority, and, therefore, are not arbitrary, capricious or irrational.  (*Id*.)

### b.      Petitioner's Opposition Memorandum of Law

Generally, in response to Respondent's motion, Petitioner asserts four arguments.  (Dkt. No. 244.)  First, Petitioner argues, at the very least, a genuine dispute of material fact exists regarding whether Petitioner had standing for purposes of Defendant's motion for summary

judgment based on the current record.  (*Id*. at 8-21.)  More specifically, Petitioner argues as

follows: (a) the scenario Respondent characterizes as speculative has already happened

(specifically, on November 4, 2021, when he moved out of Oceanview, and immediately wanted

to move back there, which ordinarily would have required him to apply for a waiver and wait

days for it to be granted); and (b) Petitioner faces a significant risk of future injury (given that the

likely injury is not limited to permanent exclusion but extends to having to jump over multiple

hurdles not confronting persons without mental illness, including the receipt of an initial denial

of his application, and the receipt of a *discretionary* waiver of that denial).  (*Id*.)

Second, Petitioner argues, Respondent's motion must be denied because it is not based on

admissible record evidence.  (*Id*. at 21-29.)  More specifically, Petitioner argues as follows: (a)

Petitioner would be unfairly prejudiced if the Court were to permit Respondent to rely on the

opinion testimony of Dr. Lloyd Sederer, because it constitutes expert testimony, and Dr. Sederer

was not designated as an expert witness (unlike Respondent's designated expert witnesses, Dr.

Thomas Smith and Kevin Martone); and (b) Petitioner would also be unfairly prejudiced if the

Court were to permit Respondent to rely on other evidence (i.e., the declarations of Heidi Hayes

and Dr. Robert Myers, and factual findings by a judge in another case to which Petitioner was not

a party), because that evidence is not based on personal knowledge, constitutes inadmissible

hearsay (without an exception), is not relevant, and/or constitutes (or is based on) undisclosed

expert testimony.  (*Id*.)

Third, Petitioner argues, at the very least, a genuine dispute of material fact exists with

regard to Petitioner's Third Claim (under the FHA).  (*Id*. at 29-38.)  More specifically, Petitioner

argues as follows: (a) the State's legal standard has no basis in the FHA's statutory text (which

9

includes an express preemption provision), is supported by only one Circuit (the Eighth Circuit), and is contradicted by three other Circuits (the Sixth, Ninth and Tenth Circuits); and (b) the Challenged Regulations are not narrowly tailored to serve a legitimate government interest, because Respondent conflates the Challenged Regulations with a Settlement Agreement in a case not involving the challenges asserted in this case, the Challenged Regulations are not supported by the Supreme Court's decision in *Olmstead*, and the Challenged Regulations are not narrowly tailored (by treating all 856 mental disabilities the same, and by relying on unfettered discretion rather than expanding the categories of persons eligible for waivers).  (*Id*.)

Fourth, Petitioner argues, at the very least, a genuine dispute of material fact exists with regard to Petitioner's Fourth Claim (under Article 78 of the N.Y. C.P.L.R.).  (*Id*. at 38-40.)  More specifically, Petitioner argues that the Challenged Regulations are arbitrary, capricious and irrational for the following reasons: (a) Respondent's argument to the contrary is based almost exclusively on inadmissible evidence; (b) the Challenged Regulations are utterly unsupported by any empirical evidence that the Challenged Regulations are actually successful at improving the lives of the mentally ill; (c) the Challenged Regulations are utterly unsupported by any empirical evidence for the specific numerical thresholds that define the facilities subject to the Challenged Regulations (again, adult homes having 80 or more beds and a seriously mental ill population of no more than 25 percent); (d) the definition of serious mental illness employed by the Challenged Regulations subjects a huge variety of widely disparate conditions to a one-size-fits-all prohibition; and (e) Respondent does not consider the impact of the Challenged Regulations on persons who require the greater level of care that ALPs provide.  (*Id*.)

c.      **Respondent's Reply Memorandum of Law**

Generally, in reply to Petitioner's response, Respondent asserts four arguments.  (Dkt. No. 246.)  First, Respondent argues, Petitioner has not met his burden of showing that he has standing to seek injunctive relief based on a threat of future injury.  (*Id*. at 6-13.)  More specifically, Respondent argues as follows: (a) Petitioner does not dispute the standards he must meet to defeat summary judgment (i.e., establishing a "sufficient likelihood" of future injury through evidentiary facts showing that he faces "a real and immediate threat of future injury"); (b) Petitioner has failed to establish that any threat of future injury is "certainly impending" (as opposed to being only possible, should he leave Oceanview again); (c) Petitioner has failed to establish that any threat of future injury is "actual or imminent" (as opposed to being only conjectural or hypothetical); and (d) Petitioner has failed to establish a sufficient likelihood of future injury, because he has shown merely an unlikely chance he would be denied readmission to Oceanview based upon the discretionary act of a third party, and he cites no evidence indicating that a wait of several days would injure him.  (*Id*.)

Second, Respondent argues, his evidence is admissible.  (*Id*. at 13-16.)  More specifically, Respondent argues as follows: (a) Dr. Sederer's testimony and exhibits are admissible, because he is merely a fact witness who is testifying based on his own personal knowledge as to issues raised by Petitioner himself (and the documents Dr. Sederer relies on either were authored by him or are relevant for the non-hearsay purpose of showing that the Regulations were sufficiently supported); and (b) Respondent's evidence is not inadmissible hearsay, because Ms. Hayes' responsibilities require knowledge of the purposes of the Challenged Regulations, the exhibits to the declaration of Dr. Myers are admissible business records under Fed. R. Evid. 803(6), admissible public records under Fed. R. Evid. 803(8), and/or admissible for non-hearsay

purposes, and the decision of another judge is relied on not for its factual findings but its legal opinion.  (*Id.*)

Third, Respondent argues, the Challenged Regulations are valid under the FHA.  (*Id*. at 16-18.)  More specifically, Respondent argues as follows: (a) differential treatment can further legitimate governmental interests, a point of law recognized in the Tenth Circuit decision on which Petitioner relies; and (b) the Challenged Regulations are narrowly tailored to serve legitimate state interests, because they complement the goals of the Settlement Agreement cited (forming part of the State's comprehensive policy designed to prevent the segregation of persons with serious mental illness), they comply with the State's obligations under *Olmstead* (by not forcing potential residents into community-based housing, but only preventing TAHs from admitting additional persons with serious mental illness), and they are narrowly tailored to serve legitimate governmental interests (given that none of the options suggested by Petitioner would serve the State's two interests of promoting integration and restricting facilities that are not clinically appropriate from admitting additional persons having a serious mental illness).   (*Id.*)

Fourth, Respondent argues, the Challenged Regulations are not arbitrary, capricious, or irrational under Article 78, which gives great deference to agency determinations.  (*Id.* at 18-20.) More specifically, Respondent argues as follows: (a) the Challenged Regulations were promulgated in connection with both the State's efforts to comply with the integration mandate pursuant to federal law, and the State's comprehensive strategy to provide community housing to people with serious mental illness in New York; (b) the Challenged Regulations are supported by a clinical determination by Dr. Sederer (in consultation with other State officials), which is supported by psychiatric research and public policy; (c) rather than being overinclusive, the

Challenged Regulations' definition of "serious mental illness" requires a person's mental illness to be the cause of functional disability, serving as a reasonable mechanism by which to identify residents whose mental illness poses particular challenges to rehabilitation and recovery; and (d) contrary to Petitioner's argument that the State does not consider the impact of the Challenged Regulations on individuals who require the greater level of care that ALPs provide, undisputed evidence shows that the State has considered the needs of such persons and has made a substantial effort to make a wide range of housing options available that provide necessary services to persons with serious mental illness. (*Id.*)

### 3.    Petitioner's Supplemental Authority and Respondent's Response

### a.    Petitioner's Supplemental Authority

After completion of the briefing on both of the above-summarized motions, Petitioner filed a Notice of Supplemental Authority (which was accepted by the Court).  (Dkt. No. 258.) More specifically, the authority submitted by Petitioner was an 81-page (single-spaced) decision dated October 6, 2022, by Justice Margaret Walsh of the New York State Supreme Court, County of Albany, in the matter of *Oceanview Home for Adults, Inc., et al. v. Zucker, et al.*  (*Id.*)

In that decision, Justice Walsh concluded (after an 18-day bench trial on Petitioners' sole remaining claim under the FHA) that "the Challenged Regulations discriminate, and cause transitional adult homes like Oceanview to discriminate, against individuals with a serious mental illness by denying them their choice of housing solely due to their having a serious mental illness." *Matter of Oceanview Home for Adults, Inc. v. Zucker, et al.*, Index No. 906012-16,

Decision/Order/Judgment, at 2, 5 (N.Y. Sup. Ct., Albany Cnty. Oct. 6, 2022).[1] As a result, Justice

Walsh annulled the Challenged Regulations, and permanently enjoined Respondents (and the

New York State Department of Health) from enforcing them. *Id.*

      In reaching her decision, Justice Walsh rendered the following findings of fact, among

others: (1) that TAHs are not "institutional" or "institution-like" settings, *id*. at 27-31; (2) that the

State failed to establish that TAHs are clinically inappropriate for, and not conducive to the

recovery of, persons with a serious mental illness, *id*. at 31-46; (3) that the Challenged

Regulations are not required by, or justified by, the Supreme Court's decision in *Olmstead*, *id*. at

48-56; (4) that the Challenged Regulations are not narrowly tailored to serve the State's interests,

*id*. at 56-59; and (5) that the Challenged Regulations harm persons with a serious mental illness,

*id*. at 59-63.  In addition, Justice Walsh considered and rejected the State's arguments that the

Challenged Regulations further a bona fide governmental interest in avoiding clinically

inappropriate placements for persons with serious mental illness, *id*. at 70–72, or in integrating

persons with serious mental illness into the community, *id*. at 72–77.

### b.    Respondent's Response

      A little over a month after Petitioner filed his Notice of Supplemental Authority,

Respondent filed a copy of an Order of Associate Justice Christine M. Clark of the New York

State Appellate Division, Third Department, dated November 1, 2022.  (Dkt. No. 259.)  In that

Order, Associate Justice Clark stayed Justice Walsh's injunction pending determination of the

---

[1]     Apparently, the petitioner's other claims had been dismissed earlier in the state court
action based on a lack of standing.  *See Matter of Oceanview Home for Adults, Inc. v. Zucker, et
al.*, Index No. 906012-16, Decision/Order/Judgment, at 2, n.2 (N.Y. Sup. Ct., Albany Cnty. Oct.
6, 2022) (noting that the petitioner's other five claims had previously been dismissed by Supreme
Court Justice Connolly for lack of standing).

appeal that had been taken from it.  *Oceanview Home for Adults, Inc. v. Zucker, et al.*, No. CV-22-1940, Order to Show Cause (N.Y. App. Div., 3d Dept., Nov. 1, 2022).

### c.      Decision by Third Department

On May 4, 2023, the Third Department issued a decision reversing the judgment of Justice Walsh.  *Oceanview Home for Adults, Inc. v. Zucker, et al.*, No. CV-22-1940, 2023 WL 3235674 (N.Y. App. Div., 3d Dept., May 4, 2023).  In so doing, the Third Department conceded that it agreed with Justice Walsh that "the regulations at issue are discriminatory on their face – regardless of their remedial purpose – insofar as the admissions cap applies solely to individuals with serious mental illness."  *Oceanview*, 2023 WL 3235674, at *4.  However, the Third Department found that "the appropriate standard to apply in gauging the propriety of the regulations under the FHA in light of the facial discrimination" was not the "least restrictive alternative standard" used by Justice Walsh, but the "narrowly tailored" standard embraced by the Sixth, Ninth and Tenth Circuits (which is "less onerous" than the standard used by Justice Walsh).  *Id*. at *4-5.  Pursuant to that standard, the Third Department held that the Challenged Regulations do not violate the FHA, because they "are narrowly tailored to implement the integration mandate of Title II of the ADA," which applies to TAHs as "public entities" (even though they are privately owned and operated).  *Id*. at *5-7.

### d.      Parties' Supplemental Letter-Briefs Regarding Decision by Third Department

At the request of the Court (Dkt. No. 263 [Text Order]), the parties have each filed a supplemental letter-brief discussing the impact of the Third Department's decision on the pending motions in this action.  (Dkt. Nos. 264, 265.)  Each side agrees that the Third Department

decision is not entitled to preclusive effect but constitutes (at most) persuasive authority, although Respondent argues that this Court should follow that authority, and Petitioner disagrees. (*Id*.)

### 4.      United States' Statement of Interest

#### a.      United States' Statement of Interest

Generally, in its Statement of Interest, the United States argues that the Challenged Regulations do not violate the FHA, because (a) under the FHA's standard for intentional discrimination, housing eligibility may be limited based on the type of disability under certain circumstances, even though this may restrict the housing choices of persons with disabilities, and (b) here, the Challenged Regulations permissibly govern the types of settings in which the State provides mental health services (which include adult homes).  (Dkt. No. 248.)

#### b.      Petitioner's Responsive Arguments

Generally, in response to the United States' Statement of Interest, Petitioner argues that the Statement is not helpful to deciding the pending motions for summary judgment for the following reasons: (a) the Statement of Interest contains several factual errors and misrepresentations (e.g., the reason for an individual's admission to a TAH, the nature of waivers issued, the reasons for denials, and Petitioner's recent readmission to Oceanview) that reflect a lack of familiarity with the facts and legal issues in this litigation and severely undermine the United States' argument; (b) the United States adds nothing to the parties' briefing on the governing legal standard, because it confusingly rejects an equal-protection analysis while arguably leaving open the possibility of heightened scrutiny (which Petitioner rejects), and incorrectly applies that standard; (c) the United States attempts to inject into this litigation a new

defense that was not pleaded by respondent, has not been developed in this litigation, and is entirely unsupported by the factual record (i.e., that the Challenged Regulations are not discriminatory at all, but instead merely involve the allocation of certain services between different types of health care settings); and (d) the theory advanced by the United States is based on a misunderstanding of the Challenged Regulations (which bar admission to persons based on their serious mental illness designation, not based on the mental health services that they are receiving or seeking) and the role of adult homes (which are not health care providers and do not themselves provide medical or mental health treatment).  (Dkt. No. 252, Attach. 1.)

    **c.**    **Respondent's Reply to Petitioner's Responsive Arguments**

Generally, in reply to Petitioner's response, Respondent argues that the United States' Statement of Interest is helpful to deciding the pending motions for summary judgment for the following reasons: (a) the Statement of Interest informs the Court that the United States views the Challenged Regulations as supportive of both the settlement that it reached in another federal case and the integration mandate that it is entrusted with enforcing; (b) the Statement of Interest expresses the view of the United States that the Challenged Regulations do not violate the FHA because, the State may permissibly limit or prioritize admission to individuals with certain disabilities that the facility is designed to serve, and ensure that mental health services are not being provided in congregate facilities that have been found by both the State to be segregated; (c) contrary to Petitioner's argument, the "new" defense asserted by the United States has been a key part of this case since its inception; and (d) Petitioner's identification of factual errors by the United States is itself erroneous.  (Dkt. No. 256.)

    **C.**    **Parties' Statements of Undisputed Material Facts**

17

### 1.     Petitioner's Statement of Undisputed Material Facts

Generally, unless otherwise noted, each of the following numbered facts has been (1) asserted, and established through a specific record citation, by Petitioner in his Statement of Material Facts, and (2) expressly admitted, or denied without a supporting specific record citation, by Respondent in his response thereto.  (*Compare* Dkt. No. 237, Attach. 1 *with* Dkt. No. 243, Attach. 1.)

1.     Adult homes are adult care facilities licensed by the State of New York, and established and operated for the purpose of providing long-term residential care, room, board, housekeeping, personal care and supervision to five or more adults unrelated to the operator.

2.     The State of New York has approved certain Transitional Adult Homes (specifically, approximately 20 of them) to become licensed to offer Assisted Living Program ("ALP") beds.

3.     On January 16, 2013, DOH published regulations that amended 18 N.Y.C.R.R. § 487.4(c) to provide that "No operator of an adult home with a certified capacity of eighty or more and a mental health census, as defined in section 487.13 (b)(4) of this Part, of 25 percent or more of the resident population shall admit any person whose admission will increase the mental health census of the facility."  The regulations also amended 18 N.Y.C.R.R. § 487 to add Section 487.13), which, inter alia, defined a Transitional Adult Home in Section 487.13(b)(1) as "an adult home with a certified capacity of 80 beds or more in which 25 percent or more of the resident population are persons with serious mental illness as defined in section 487.2(c) of this Part."

4.     John Doe is a resident of Oceanview Manor who suffers from schizophrenia.

5.      Mr. Doe has been a resident of Oceanview Manor for at least ten years.

6.      In 2014, Mr. Doe moved into supportive housing.

7.      Over the next two years, Mr. Doe moved between several different apartments.

8.      In one supportive housing apartment, a roommate started a fire in the bathroom, which Mr. Doe cited as a reason for his decision to move out.

9.      Another apartment was infested with roaches which would keep crawling onto his pillow while he slept.

10.     A third apartment had a leaky ceiling.

11.     Mr. Doe sometimes went hungry because he was running low on money for food; so he would call his friend, who would bring him food.

12.     In 2017, while living in supportive housing, Mr. Doe was visited by Lisa Vider (the administrator of Oceanview Manor), who observed him to be sweating, have pink eye in both of his eyes, and look tired and not like his usual self.

13.     Ms. Vider believed that the apartment in which Mr. Doe was living was uninhabitable.

14.     Ms. Vider observed that there was open garbage throughout the apartment, the bathroom was filthy (looking as if it had never been cleaned), and there was a bare mattress on the floor.

15.     Mr. Doe sought to return to his former adult home at Oceanview Manor in 2016; but, because Oceanview Manor is a Transitional Adult Home and Doe is designated as having SMI, the Challenged Regulations prohibited Oceanview Manor from accepting him back.

16.     On November 22, 2016, Mr. Doe filed his Petition against Respondent Howard

19

Zucker, the then-Commissioner of the New York State Department of Health, alleging, among other things, that the Challenged Regulations discriminate on the basis of disability in violation of federal law.

17.     Oceanview Manor admitted Petitioner as a resident after Justice Denise A. Hartman, Supreme Court Albany County, issued a Temporary Restraining Order in the case on February 16, 2017 (and after District Judge Nicolas G. Garaufis of the United States District Court of the Eastern District of New York directed on March 22, 2017, that Petitioner be permitted to return to Oceanview Manor).

18.     Since moving back to Oceanview Manor, Mr. Doe has exhibited (in Ms. Vider's opinion) good personal grooming and lived in clean quarters.

19.     Mr. Doe hopes to once again move out of Oceanview Manor into independent housing.

20.     If Mr. Doe were to have a bad experience again in his own apartment, he would want to be able to move back into Oceanview Manor.

21.     Petitioner's expert, Dr. Lama Bazzi, has opined, *inter alia*, that (1) "unlike the NYS SMI definition, the DSM-5 definition does not place a permanent label of SMI on the individual based solely upon the fact that they met criteria for an impairing DSM-5 psychiatric disorder at one point in time," and (2) "[t]he NYS definition of SMI expands the definition of functional disability so completely that it acts as a catchall statement, encompassing all Medicaid recipients who received a DSM-5 psychiatric diagnosis at some point and take medications to

control psychiatric symptoms that would be difficult to control otherwise."[2]

22.     Valerie Deetz (Director of the Division of Adult Care Facilities and Assisted

Living Surveillance at the New York State Department of Health), Dr. Lloyd Sederer and Dr.

Robert Myers have each testified that they are not aware of any study or analysis by the New

York State Department of Health demonstrating that other existing residents in the TAHs will

benefit from a reduction in SMI census.[3]

23.     The Challenged Regulations do not ensure that persons excluded from admission

into a transitional adult home will be placed in a more appropriate setting (although the State

does assist persons with serious mental illness in making more appropriate housing options

available to such persons).  When somebody with serious mental illness cannot move into a

transitional adult home, DOH does not follow where that person goes (although other State

agencies, including the New York State Office of Mental Health, follow the placement of such

persons).

24.     Although adult homes are not health care providers, they do have various

responsibilities, including providing for room and board, case management, housekeeping and

food service, assisting with medication and arranging for medical appointments.

25.     The State has taken certain steps that it describes as complying with its

---

[2]     The Court notes that it respectfully disagrees with Respondent to the extent that he argues
that Dr. Bazzi is not qualified to opine about such issues under Fed. R. Evid. 702.  (Dkt. No. 243,
Attach. 1, at ¶ 21.)

[3]     Despite the above-cited testimony, Respondent cites various portions of the record
supporting the fact that there exists a consensus in the mental health field that residents in
Transitional Adult Homes benefit from the desegregation of persons with serious mental illness
in Transitional Adult Homes. (Dkt. No. 243, Attach. 1, at ¶ 22.)

obligations under *Olmstead*, which include the provision of supportive housing units and the in-reach program designed to facilitate adult home residents moving out into settings described by the State as more integrated.

26.     The State's expert in public mental health housing policy, Kevin Martone, has testified he is not aware of any state other than New York whose *Olmstead* plan has adopted a preclusion of admission of persons with serious mental illness into any housing setting.

27.     Dr. Sederer is a psychiatrist and public health doctor. He was the Chief Medical Officer of OMH from 2007 to April 2019.

28.     Dr. Sederer has testified that he is not aware of any evidence-based study, report or analysis that compares the recovery of a person in an adult home versus supported housing or that reviews how residents who transition from an adult home to supported housing do in the supported housing versus the adult home.

29.     Dr. Sederer and Dr. Myers have each testified that they know of no studies that assess the extent to which persons with serious mental illness can recover while residing in an adult home.

30.     Dr. Thomas E. Smith has testified that he is not aware of any formal studies or statistical analyses concerning where prospective residents of Transitional Adult Homes are actually residing.

31.     Dr. Sederer has testified that he is not aware of any evidence-based study, report or analysis that compares the recovery of a person in an adult home versus the recovery of a person in supported housing.

32.     Dr. Smith has testified that he is not aware of any studies or statistics that reflect

22

an improvement in health outcomes at Transitional Adult Homes that have had significant reductions in their censuses of persons with serious mental illness.

33.     At least one individual with a serious mental illness (i.e., Petitioner) has suffered significant deterioration after moving out of a transitional adult home.[4]

34.     Petitioner failed in supportive housing, but flourished when able to return to a transitional adult home.[5]

35.     Robert Myers, an OMH official, has testified that people in supported housing, just like people in the general population, sometimes do poorly in circumstances and sometimes struggle with situations, such as experiencing physical health symptoms, managing money, adhering to medication regimens, missing medical appointments, and maintaining their diets and mental health issues.

36.     Expert witnesses, including the State's own experts, have emphasized that an informed choice is one of the factors important with respect to recovery.

37.     Part of making a treatment decision includes many things, including housing.

_____

[4]     Although Respondent denies any causal connection implied by the word "after" in the above-stated fact, the fact does not explicitly state that such a causal connection exists.  (Dkt. No. 243, Attach. 1, at ¶ 33.)  *See also* N.D.N.Y. L.R. 7.1(a)(3) ("The non-movant's responses shall . . . admit[] and/or deny[] each of the movant's *assertions* in matching numbered paragraphs.") (emphasis added); *Yetman v. Capital Dis. Trans. Auth.*, 12-CV-1670, 2015 WL 4508362, at *10 (N.D.N.Y. July 23, 2015) (citing authority for the point of law that the summary judgment procedure involves the disputation of asserted facts, not the disputation of implied facts).  Nor does the record evidence cited by Respondent actually controvert any such causal relationship implied by the above-cited fact (which regards Petitioner's experience in the opinion of Lisa Vider).  (Dkt. No. 243, Attach. 1, at ¶ 33.)

[5]     Although Respondent denies any causal connection implied by the word "when" in the above-stated fact, the above-stated fact does not explicitly state that such a causal connection exists.   (Dkt. No. 243, Attach. 1, at ¶ 34.)   *See also, supra,* note 4 of this Decision and Order.

38.     When New York State psychiatric centers engage in discharge planning, they develop plans of care that consider the needs of the individual.

39.     Dr. Sederer and Dr. Lisa Dixon, both of whom who are psychiatrists, have testified that, in their general private practice, they do an evaluation of a patient before making a treatment decision.

40.     Dr. Sederer has testified that, with respect to psychosocial treatment, the establishment of a doctor-patient relationship requires an intimate knowing of the life of another person, including an understanding of the patient that distinguishes the characteristics of each person so that the doctor can individualize his or her approach to the patient.

41.     Dr. Sederer has also testified that, in pursuit of the recovery of a patient, patient choice is very important.

42.     Dr. Sederer has also testified that part of making a treatment decision can include many things, including housing, which is probably one of the best predictors of how somebody will function, that person's quality of life, and that person's capacity to engage in treatment.

43.     At 10:15 a.m. on Thursday, May 10, 2012, Richard Zahnleuter (Direct of Bureau of Litigation of Division of Legal Affairs of NYS DOH) sent an email to Foster Gesten (Medical Director of NYS DOH) regarding his "preparation . . . of a clinical advisory regarding mentally ill residents of adult homes," about which the Governor's Office had asked for an "immediate[]" update.  At 10:35 a.m. that day, Gesten sent an email to Llyod Sederer (Medical Director of NYS OMH) which forwarded Zahnleuter's email, and stated that he (Gesten) did not "know anything about this . . . ."  At 11:18 a.m. that day, Sederer sent an email to Gesten stating that he (Sederer) had "heard [about] this last night from omh legal counsel," and that he (Sederer) had "said yes,"

because there was "[e]nuf wiggle room," and "[p]lus [he had] no choice."  At 11:06 a.m. on Monday, May 14, 2012, Jennifer Moore (of NYS DOH Division of Legal Affairs) sent an email to Gesten regarding his role in preparing a clinical advisory (in conjunction with OMH) for limiting the mental health census in certain adult homes to 25% of their resident census, in order to provide clinical support for proposed regulations that been given "priority" by the Governor and were due on Thursday, May 17, 2012. At 12:49 p.m. that day, Gesten sent an email to Sederer stating that Moore was "urgently looking for a 'clinical advisory' . . . which provides a clinical justification for reduction in numbers of SMI in adult homes to something like 20-25% that seems to be targeted," expressing his (Gesten's) hope that Sederer and others at OMH "can take the lead in such an advisory," and asking him (Sederer) to call Gesten if he (Sederer) needed to discuss it. At 3:16 p.m. that day, Gesten sent an email to Moore asking, "What is contained in a 'clinical advisory' on this, beyond the 25 percent recommendation?" and stating, "As I said to Jim Dering and Rick Z (and Dr. Sederer from OMH), this (a judgment about ideal percentage of individuals in an adult home with SMI) is not based on clinical evidence or expertise. This is a policy decision which, if the Gov's office wants the two agencies to jointly endorse, so be it."

44.     In his deposition and trial testimony, Dr. Sederer could not point to any published evidence supporting the 25-percent threshold or the 80-bed threshold, only his own "clinical opinion" that "when settings have increasing numbers of individuals and . . .  a significant population of them had serious mental illness, . . . [then] the general environment . . . starts to feel large and institutional and is not conducive to recovery."  He explained that this clinical opinion is based on "decades of material in mental health, in sociology and public service and social services," that didn't say 80 beds" but that showed that "institutions are not good for

people" and that "institutions are bad for people."

45.     In his deposition, Dr. Sederer testified that the 25-percent threshold and 80-bed threshold came from a collaboration between, and discussion among, himself and three other DOH and OMH officials (i.e., OMH Commissioner Dr. Michael Hogan, DOH Medical Director Dr. Foster Geston, and OHM General Counsel John Tauriello) regarding the question of "when is the percentage [of people with a serious mental illness] getting too high . . . ."   "[I]n the end," testified Dr. Sederer, "it was my responsibility and my decision to say 80 beds and 25 percent." He then explained that this decision or clinical opinion was based on "decades of material in mental health, in sociology and public service and social services, [and] that institutions are not good for people, that institutionalization is bad for people . . . ."

46.     As stated earlier, Dr. Sederer was unable to cite any published "evidence-based support" for the 80-bed threshold.

47.     Before opining about the 80-bed and 25-percent thresholds, Dr. Sederer had not visited an adult home of more than 80 beds with an SMI population of more than 25 percent (other than an adult home he thinks he went to near the ocean).

48.     Before Dr. Sederer formed this opinion, the 80-bed threshold had not been specifically suggested to him by anybody that he can recall.

49.     Before Dr. Sederer formed this opinion, the 80-bed threshold had not been recommended in professional literature that he can recall.

50.     Before Dr. Sederer formed this opinion, he had not read in any professional literature anybody recommending that there be a maximum number of beds for which it would be clinically appropriate for residents to live, that he can recall.

51.     Before Dr. Sederer formed this opinion, the 25-percent threshold had not been
"expressed" to him by any other clinician that he can recall, or recommended in any published
work that he can recall.

52.     Petitioner's expert, Dr. Lisa Dixon, has testified that the Challenged Regulations
employ a definition of a "serious mental illness" that encompasses different mental disorders,
including eating disorders and sexual function disorders (although she has also testified that she
believes the definition is "reasonable").

53.     Granted, the Challenged Regulations' definition of "[p]ersons with serious mental
illness" requires not just that such persons have a designated diagnosis of mental illness, but also
that the "severity and duration of mental illness results in substantial functional disability."
However, Dr. Dixon has opined that, pursuant to New York State's definition of "substantial
functional disability," such a disability can occur merely when an individual suffers from two of
the following four functional limitations (due to a mental illness) over the prior 12 months on a
continuous or intermittent basis: (1) frequent demonstrated deficiencies in practicing basic daily
living skills such as bathing, eating, dressing; (2) frequent demonstrated deficiencies in
practicing instrumental living skills such as paying bills, getting from one place to another,
housekeeping, and keeping appointments; (3) frequent demonstrated deficiencies in functioning
in family, social, interpersonal, vocational, and recreational settings; and (4) frequent
demonstrated deficiencies in concentration, persistence or pace resulting in a failure to complete
tasks in a timely manner.

54.     Moreover, Dr. Dixon has opined that, alternatively, "NYS OMH considers
reliance on psychiatric treatment, rehabilitation and supports to constitute extended impairment

27

in functioning due to mental illness." As a result, Dr. Dixon has opined, "if the individual's history shows that the individual, at some prior time, met the threshold for extended impairment in functioning due to mental illness but that they are [sic] in treatment and the treatment is controlling their [sic] symptoms (as with medications, psychotherapy, or other psychosocial supports) then they are [sic] considered to be suffering under a substantial functional disability . . . ."

55.     As stated earlier, Dr. Dixon has also opined that New York State's definition of SMI differs from the DSM-V's definition of SMI in that the latter (which acknowledges that SMI results in serious functional impairment that substantially interferes with or limits at least one or more major life activities) "does not place a permanent label of SMI on the individual based solely upon the fact that they met criteria for an impairing DSM-5 psychiatric disorder at one point in time."

56.     In Dr. Dixon opinion, "[t]he overly inclusive and unscientific definition of SMI unjustly deprives individuals of housing options that are available to patients not labeled SMI, without accounting for the individual's actual psychiatric symptoms or their impact on the individual's quality of life."

57.     Dr. Dixon has also opined that, "[b]y labeling individuals as SMI and then categorically excluding those labeled as SMI from Transitional Adult Home settings, without relying on objective and reliable standards, New York State deprives individuals labeled as SMI of the opportunity to make a reasonable and rational choice regarding Transitional Adult Homes and the services they offer."

58.     The Assisted Living Program ("ALP") serves persons who are medically eligible

28

for nursing home placement but serves them in a less medically intensive, lower cost setting.

59.     To be eligible for admission to an ALP, a person must require more care and services to meet his or her daily health or functional needs than can be directly provided by an adult care facility; and, although medically eligible for placement in a residential health care facility, the person must require care that can be appropriately cared for in an Assisted Living Program.  The ALP provides personal care, room, board, housekeeping, supervision, home health aides, personal emergency response services, nursing, physical therapy, occupational therapy, speech therapy, medical supplies and equipment, adult day health care, a range of home health services, and the case management services of a registered professional nurse.

60.     Ms. Deetz and David Nikic have testified that the Challenged Regulations do not treat as a "factor" the fact that people with serious mental illness often suffer from a multitude of medical and physical comorbidities that may require the services of an ALP.[6]

61.     Petitioner's expert, Dr. Bazzi, has opined that several medical comorbidities are present disproportionately in persons with SMI.[7]

62.     During a trial, Valerie Deetz (Director of the Division of Adult Care Facilities and Assisted Living Surveillance at the New York State Department of Health) has testified that, if somebody with a serious mental illness cannot be admitted into a transitional adult home, then

---

[6]     Although Respondent denies the above-stated fact on the ground that "[t]here is no evidence that the Challenged Regulations are preventing persons with serious mental illness that suffer from a multitude of medical and physical comorbidities from receiving necessary services," the above-stated fact does not explicitly state that such persons are so prevented.  (Dkt. No. 243, Attach. 1, at ¶ 60.)  *See also, supra,* note 4 of this Decision and Order.

[7]     Again, the Court rejects Respondent's argument that Dr. Bazzi is not qualified to opine about such issues under Fed. R. Evid. 702.  (Dkt. No. 243, Attach. 1, at ¶ 61.)  *See also, supra,* note 2 of this Decision and Order.

that person cannot be admitted into the ALP program inside the transitional adult home.

63.     Petitioner's expert, Dr. Bazzi, has opined that the Challenged Regulations

discriminate against people who have both an SMI and "medical comorbidities."[8]

64.     Finally, Dr. Bazzi has opined that, "[b]y denying patients with SMI the choice to

move into a TAH/AH, New York State is not fostering independent decision making,

encouraging autonomy, meeting individuals wherever they are in the recovery process, or

instilling confidence in the individual's ability to recover."[9]

### 2.     Respondent's Statement of Undisputed Material Facts

Generally, unless otherwise noted, each of the following numbered facts has been (1)

asserted, and established through a specific record citation, by Respondent in his Statement of

Material Facts, and (2) expressly admitted, or denied without a supporting specific record

citation, by Petitioner in his response thereto.  (*Compare* Dkt. No. 238, Attach. 37 *with* Dkt. No.

244, Attach. 1.)

<u>Background of the Regulations</u>

1.     On January 16, 2013, the Department of Health of the State of New York

("DOH") promulgated the Regulations challenged in this case ("Regulations").

2.     A little more than nine months before DOH did so, the Second Circuit had

dismissed, for lack of standing, an action that had been initiated in 2003 in the U.S. District

Court for the Eastern District of New York (Action No. 03-CV-3209) by a private nonprofit

organization contracted to provide services to certain individuals with mental illness (and

---

[8]     (*Compare* Dkt. No. 237, Attach. 1, at ¶ 65 *with* Dkt. No. 243, Attach. 1, at ¶ 65.)

[9]     (*Compare* Dkt. No. 237, Attach. 1, at ¶ 66 *with* Dkt. No. 243, Attach. 1, at ¶ 66.)

eventually joined by the United States Department of Justice or "DOJ") against the Governor of

New York State, the Commissioners of the New York State DOH and OMH, and the DOH and

OMH themselves: *Disability Advocates, Inc. v. New York Coal. for Quality Assisted Living, Inc.*,

675 F.3d 149 (2d Cir. Apr. 6, 2012).

3.      Generally, the Complaint in that prior action alleged that certain adult homes in

New York City were not the most integrated setting appropriate for individuals with serious

mental illness, resulting in discrimination against individuals with disabilities in violation of the

"integration mandate" of Title II of the Americans with Disabilities Act ("ADA"), as set forth in

the U.S. Supreme Court's landmark decision of *Olmstead v. L.C.*, 527 U.S. 581 (1999).

4.      After a five-week bench trial, the United States District Court for the Eastern

District of New York determined that the State's reliance on certain large adult homes

predominantly occupied by persons with serious mental illness violated the ADA and *Olmstead*.

5.      As indicated above, that decision was ultimately vacated by the United States

Court of Appeals for the Second Circuit because the plaintiff lacked associational standing. In so

doing, the Second Circuit acknowledged that "the United States—whose standing is not

disputed—has represented that, in the event of a dismissal on the basis of standing, it would

re-file the action and submit the same evidence at a subsequent trial."

6.      A little more than 15 months later, DOJ, as well as a group of individuals, filed

related actions, essentially re-asserting claims originally brought in *Disability Advocates, Inc. v.*

*Paterson*, 03-CV-3209 (E.D.N.Y.): *United States v. New York*, 13-CV-4165 (E.D.N.Y.) and

*O'Toole v. Cuomo*, 13-CV-4166 (E.D.N.Y.).

7.      Following negotiations, the State settled those claims, agreeing to a procedure

that, generally, would assist adult home residents with serious mental illness who desire to transition to community-based supported housing and other integrated settings.

8.      Before the State's settlement negotiations concluded in July of 2013, DOH promulgated the Regulations on January 16, 2013.

9.      The State believes that these Regulations are part of the State's strategy to assist persons with serious mental illness to transition from Transitional Adult Homes to "more integrated settings."

10.     The Regulations define a Transitional Adult Home as "an adult home with a certified capacity of 80 beds or more in which 25 percent or more of the resident population are persons with serious mental illness."

11.     The Regulations provide that a Transitional Adult Home cannot increase the percentage of its residents with serious mental illness: "No operator of an adult home with a certified capacity of 80 or more and a mental health census … of 25 percent or more of the resident population shall admit any person whose admission will increase the mental health census of the facility."

<u>Petitioner's Claims Challenging the Regulations</u>

12.     Petitioner commenced this proceeding in Albany Supreme Court on November 22, 2016.

13.     After moving to supported housing, Petitioner sought to return to Oceanview Manor Home for Adults ("Oceanview"), where he previously resided.

14.     Oceanview is a Transitional Adult Home as defined in Section 487.13(b).

15.     On March 22, 2017, Petitioner was permitted to be readmitted to Oceanview as a

result of the TRO issued in this case enjoining the enforcement of the Challenged Regulations.

16.     On September 8, 2017, Intervenor-Respondents removed Petitioner's state court action to this Court.

17.     On or about October 31, 2017, Petitioner returned as a resident to Oceanview, where he currently resides.

### State's Effort to Accommodate Former Residents of Transitional Adult Homes

18.     According to the testimony of Heidi Hayes (who has been the Acting Director of the Division of Adult Care Facility and Assisted Living Surveillance in the New York State Department of Health since April 2019, and had been a Health Program Administrator II since March 2010), "[s]ince adoption of the Regulations, DOH has promulgated amendments to the Regulations based on DOH's experiences with implementations of the Regulations."

19.     Ms. Hayes has also testified that, "[u]nderstanding that circumstances may arise where individuals transition from a Transitional Adult Home to the community and desire to return to their prior residence/setting, the DOH wanted to establish 'a right to return" for such individuals."

20.     Ms. Hayes has also testified that, "[t]o facilitate this process, DOH sent adult home operators a 'Dear Administrator Letter' ('DAL 19-03'), informing them that DOH was adopting a waiver provision that would permit Transitional Adult Homes to admit, as new residents, persons with serious mental illness who had previously resided in a Transitional Adult Home."

21.     DAL 19-03 stated, in part, as follows: "The Department recognizes that discharged residents with Serious Mental Illness may express a desire for admission to a

Transitional Adult Home. Such request may be accommodated if: (1) the Adult Care Facility is able to ascertain the resident meets applicable admission and retention criteria; and (2) prior to that residents admission to the Transitional Adult Home, a waiver of 18 NYCPRR §487.4(d) is requested by the Transitional Adult Home and subsequently approved by the DOH utilizing the established waiver approval process."

22.     On October 23, 2019, the State began the process of incorporating a waiver-approval procedure into the Regulations by promulgating an emergency rule.

23.     On October 23, 2019, the State promulgated an emergency rule that amended the Regulations.

24.     On January 22, 2020, the State published a notice in the New York State Register ("Jan. 22, 2020, NYS Register") extending the emergency regulation amending the DOH Regulations to be effective until March 31, 2020.

25.     The waiver provision for former residents of Transitional Adult Homes became a permanent rule on March 25, 2020, adopted as a final amendment to the Regulations, that incorporated the waiver provision into the DOH Regulations.

26.     Since March 25, 2020, amended regulation § 487.4(e)(3)(ii) has provided as follows: "The operator may admit the prospective resident only when the mental health evaluation concludes the individual: (a) is not a person with serious mental illness; or (b) is a person with serious mental illness, but the individual is a former resident of a transitional adult home and the operator obtains a waiver approved by the Department pursuant to subdivision (g) of section 487.3 of this part."

27.     From October 2019—when DOH began the process of incorporating the waiver

34

provision into the permanent Regulations—to the present, DOH has received multiple requests for waivers from Transitional Adult Homes.

28.     Requests by Transitional Adult Homes for waivers submitted pursuant to the amended Regulations have been denied in the following circumstances: (a) the waiver provision was not applicable, for example, the waiver was not sought for a specific individual with serious mental illness who was a "former resident of a Transitional Adult Home" (meaning a former resident of a *current* Transitional Adult Home); (b) the request was incomplete or contained outdated information, for example, the request was not fully filled out or the mental health evaluation was more than 30 days old (at the time the request was considered, not the time the request was received); or (c) in one circumstance (involving eight separate applications), the Transitional Adult Home had an uncorrected regulatory violation that directly impacted the health, safety and/or well-being of its residents and/or prospective residents.

29.     Other than the denials described in the prior paragraph, since the promulgation of the emergency regulation in October 2019, 17 Transitional Adult Homes have submitted waiver requests for 90 individuals to DOH that were both complete and showed that the individuals were former residents of Transitional Adult Homes with serious mental illness. DOH granted waivers to the Transitional Adult Homes to admit all 90 of those individuals.

30.     Ms. Hayes has testified that, "[s]ince promulgation of the emergency regulation in October 2019, once DOH has received a completed request from a Transitional Adult Home for a waiver to admit a former resident of a Transitional Adult Home with serious mental illness, in the majority of cases DOH has granted the waiver within 4.75 days, with some approvals being made on the date the completed request was received" (except for the period of March 2020 to

35

October 2021, when the processing times slowed to an average of 5.5 days due to COVID-19).

31.     There are currently 406 adult homes in the State of New York.

32.     The number of Transitional Adult Homes in New York State has decreased from 49 in January 2013 (when the Regulations were promulgated) to 33 in the second quarter of 2021.[10]

33.     The Regulations apply to only eight percent of adult homes in New York State.[11]

The State's Supported-Housing Initiative

34.     Pursuant to an executive order, 9 N.Y.C.R.R. § 8.5, which was issued in January 2011, New York State has been implementing the Medicaid Redesign Initiative.  According to the testimony of Dr. Robert Myers (who has been the Senior Deputy Commissioner and Division Director of Community Program Management and Managed Care within the New York State Office of Mental Health since 2018, and before that was the Senior Deputy Commissioner and Division Director of State Psychiatric Centers and Managed Care since 2004), the initiative

---

[10]     Petitioner improperly denies a perceived implication of the above-stated factual assertion by Respondent, which explicitly states nothing about the cause of the decrease.  (*Compare* Dkt. No. 238, Attach. 37, at 32 *with* Dkt. No. 244, Attach. 1, at ¶ 32.)  *See, also,* note 4 of this Decision and Order.

[11]     Petitioner improperly denies the above-stated factual assertion on the ground that it is "misleading" (by describing only the percentage of facilities and not the percentage of total beds).  The above-stated factual assertion states nothing about beds, rendering a statement about beds to be a mere implication.  (Dkt. No. 244, Attach. 1, at ¶ 33.)  The summary judgment procedure involves the disputation of asserted facts, not the disputation of implied facts.  *See, supra,* note 4 of this Decision and Order.  Moreover, even if responsive to the above-stated factual assertion, Petitioner provides no record cite in support of his factual assertions regarding the number of "small facilities" excluded, the geographic distribution of homes, and whether those homes provide ALP services.  (Dkt. No. 244, Attach. 1, at ¶ 33.)

"aims to transition all Medicaid recipients, including people with serious mental illness, from unmanaged to managed care and to create a fully integrated behavioral health and physical health service system that provides comprehensive and recovery-oriented services. As part of this effort, the State has been working towards increasing the availability of supported housing for high-need Medicaid recipients who are homeless, precariously housed or living in institutional settings."

35.     According to the testimony of Dr. Myers, "New York State develops various types of additional supportive housing every year, funded by a combination of state and federal funding. OMH has funded or licensed total of approximately 46,786 units of supportive and supported housing units to date. This includes approximately 20,643 units of supported housing that OMH funds."

36.     According to the testimony of Dr. Myers, "[t]he State Fiscal Year 2019-2020 Enacted Budget continues funding to advance the New York State's comprehensive, five-year plan for affordable and supportive housing, including building over 6,000 supportive housing units."

37.     According to the testimony of Dr. Myers, "[b]eginning with the 2014 to 2015 fiscal year, and continuing through the 2015 to 2016 fiscal year, OMH pre-invested $59 million annualized into priority community services and supports, with the goals of reducing State and community-operated facilities' inpatient psychiatric admissions and length of stay."

38.     According to the testimony of Dr. Myers, "[i]n addition, $15 million has been reinvested from Article 28 and 31 inpatient facilities to further support the OMH's initiative, which is to allocate more funding for housing for people with serious mental illness."

39. According to the testimony of Dr. Myers, "[s]ince 2014, 1,136 individuals with serious mental illness have been placed in supported housing. Currently the State of New York provides financial support of over $24,000 per person as housing subsidies for supported housing, which is the highest level in any state-funded supported-housing program."

40. According to the testimony of Dr. Myers, "OMH-funded Supported Housing contractors provide 'in-reach' services to adult home residents with serious mental illness, by engaging with them and offering information about various housing and service options available, and thereby ensuring that individuals with serious mental illness are equipped to make autonomous, informed decisions as to whether to move out of Transitional Adult Homes and into more integrated community settings."

41. OMH also contracts with two agencies that provide Peer Bridgers support services to class members residing in adult homes.

42. According to the testimony of Dr. Myers, "Peer Bridgers are persons with lived experience with mental health issues. In the settlement these individuals assist adult home residents in making the transition into supported housing. A minimum of two full-time equivalents ('FTE') are assigned to each adult home with the goal of getting to know each of the persons covered by the Settlement and to help them transition from Transitional Adult Homes to the community.[12]

43. According to the testimony of Dr. Myers, "Peer Bridgers function as mentors, advocates, and supporters of persons in these homes and work closely with the in-reach teams, assessors, care managers, and housing contractors. Peer Bridgers are also available to meet with

---

[12] (Dkt. No. 238, Attach. 7, at ¶ 24 [Myers Decl.].)

class members once they have transitioned into the community."[13]

44.    According to the testimony of Dr. Myers, "[t]o further the State's compliance with its *Olmstead* obligations, OMH endeavors to place people with serious mental illness into several types of community settings. Among those community settings are a spectrum of housing settings less restrictive than psychiatric hospitals, nursing homes, or adult homes. When an individual is discharged from a psychiatric hospital, there is a range of housing options available according to the individual's needs."

45.    According to the testimony of Dr. Myers, "[t]hese housing programs encompass several models that range from the highest level of support to minimal housing case management in apartment settings. Most of these housing models are operated by not-for-profit agencies contracting with OMH."

46.    According to the testimony of Dr. Myers, "[a]vailability of these various types of housing enables individuals with serious mental illness access to the housing setting that is most appropriate for their individual needs. This further safeguards against individuals with serious mental illness being forced to remain in psychiatric hospitals, unduly waiting for discharge."

<u>Public Policy and Community Integration</u>

47.    In 1999, the American Psychiatric Association ("APA"), which is the world's largest organization of physicians specializing in psychiatry, submitted an amicus brief to the United States Supreme Court in *Olmstead*. The amicus brief opined that "depriving an individual with a disability of the benefits of community integration, unless such a community setting is inappropriate for the individual, is a form of discrimination (where other recipients of

---

[13]    (*Id.*)

government services need not sacrifice their interests in community integration)."

48.     Quoting portions of a piece of the legislative history of Title II of the ADA, the amicus brief further stated, "Congress clearly understood that the integration of people with disabilities will sometimes involve substantial short-term burdens, both financial and administrative–justified by the prospect that the long-range effects of integration will benefit society as a whole" (internal quotation marks omitted).

49.     According to the testimony of Dr. Lloyd Sederer, M.D. (who was the Chief Medical Officer of OMH from 2007 to 2019), "The APA issues position statements that explain and emphasize the APA's official policy on specific subjects. In May 2005, the APA issued such a statement, 'Position Statement on the Use of Concept of Recovery' outlining the APA's model of recovery. . . . The statement explains that '[t]he concept of recovery emphasizes a person's capacity to have hope and lead a meaningful life' and 'encourages patients to participate actively in their care' and that '[t]he concept of recovery values include maximization of 1) each patient's autonomy based on that patient's desires and capabilities, 2) patient's dignity and self-respect, 3) patients' acceptance and integration into full community life, and 4) resumption of normal development.'"

     OMH's Missions and Responsibilities for Individuals with Serious Mental Illness

50.     According to the testimony of Dr. Myers (who, again, has been the Senior Deputy Commissioner and Division Director of Community Program Management and Managed Care within the New York State Office of Mental Health since 2018, and before that was the Senior Deputy Commissioner and Division Director of State Psychiatric Centers and Managed Care since 2004), "[f]or well over a decade, OMH has been developing, expanding and implementing

multiple policies that seek to improve the housing of persons with serious mental illness."

51. According to the testimony of Dr. Myers, "[i]n mid-2007, OMH issued a policy document entitled 'Guiding Principles for the Redesign of the Office of Mental Health Housing and Community Support Policies' ('OMH Guiding Principles'). That policy statement asks stakeholders in New York's mental health housing policies and programs—such as local government, consumers, family advocate and providers—to send any comments and feedback on these principles to me at OMH."

52. According to the testimony of Dr. Myers, "[t]he OMH Guiding Principles begin by stating that '[s]afe, decent and affordable housing is a cornerstone of recovery from mental illness . . . .' That policy statement identifies the 'need for decent, safe and affordable housing—often with supports' as a very substantial unmet need for people with mental illness. The OMH Guiding Principles then identifies groups of 'people with a mental illness [who] are poorly housed or institutionalized,' including the 'many people with a mental illness [who] are stuck in adult homes and other 'institutional settings.' The document discusses meeting the needs of these people by reforming mental health housing policies and programs through the 'creation of local systems of care that reduce institutionalization, homelessness, people stuck in acute care settings, and waste.' The policy statement also notes that '[t]he primary goal of housing reform will focus on the individual and emphasize expanding access to supported housing.'" (internal quotation marks omitted).

53. In 2007, the then-Commissioner of Mental Health, Michael Hogan, requested that OMH complete a system-wide report assessing the State's public mental health system. In attempting to comply with Commissioner Hogan's request, Dr. Sederer (then the Chief Medical

Officer of OMH) authored a "blueprint" for OMH, i.e., a report entitled "An OMH Assessment

of Clinical Care, Professional Workforce, Research, and Local Government Opportunities" (the

"OMH Assessment").

54.     According to the testimony of Dr. Sederer, "[t]he OMH Assessment outlines

OMH's vision for change in 2007, which OMH continued to implement during my tenure there.

An integral component of this vision is that persons with serious mental illness are capable of

leading productive lives outside of institutions and that OMH should assist its consumers in

pursuing fulfilling lives in their communities."

55.     According to the testimony of Dr. Sederer, "[t]he OMH Assessment also

addresses the importance of a 'partnership between provider and consumer,' in which consumers

seek and providers enable lives of contribution and self-respect while living in and being a part

of their communities."

56.     According to the testimony of Dr. Sederer, "[t]he OMH Assessment further

recognizes the impact of large adult homes on persons with serious mental illness and the need

for OMH to pursue opportunities for 'innovative community living alternatives . . . that build on

normalcy and community integration for those with mental disabilities.' . . . Noting the reality

that '[n]o one recovers from a mental (or substance abuse) disorder unless he or she is safely and

reliably housed,' the OMH Assessment addresses the need for supportive housing for 'people

languishing in adult homes that are a blight on our care system . . . .'"

57.     According to the testimony of Dr. Myers, "Consistent with [New York State's]

policy goals, New York's *Olmstead* obligations and the Americans with Disabilities Act, New

York State has developed a comprehensive *Olmstead* implementation plan that addresses, among

other things, meeting the needs of individuals with disabilities through integrated housing. On

November 30, 2012, Governor Cuomo issued Executive Order No. 84, 9 N.Y.C.R.R. § 8.84,

attached hereto as Exhibit E, which set forth the framework for the development and

implementation of an *Olmstead* plan for New York State."

58.     According to the testimony of Dr. Myers, "New York State issued this plan in a

report entitled the 'Report and Recommendation of the *Olmstead* Cabinet: A Comprehensive

Plan for Serving New Yorkers with Disabilities in the Most Integrated Setting' (the 'Olmstead

Plan') in October of 2013. . . . Among the efforts described by the Olmstead Plan are New

York's 'comprehensive strategy' to assist persons with serious mental illness to transition from

Transitional Adult Homes to 'more integrated settings.'"

59.     According to the testimony of Dr. Myers, "[t]hese efforts affirm the State's

position as a national leader on disability rights."

60.     According to the testimony of Dr. Sederer, "During my tenure as Chief Medical

Officer of OMH, OMH periodically issued clinical advisories on public mental issues to provide

guidance to providers and the general public. These clinical advisories, drafted by myself and

other mental health professionals, were efforts by OMH to identify risk situations, suboptimal

practice activities, or opportunities for improvement."

61.     According to Dr. Sederer, "[i]n 2012, officials at DOH and OMH asked for my

clinical opinion regarding the appropriateness of adult homes as residences for large numbers of

individuals with serious mental illness."

62.     On or about August 8, 2012, Dr. Sederer issued a Clinical Advisory with regard to

Transitional Adult Homes.

63.    The Clinical Advisory of August 8, 2012, states that Transitional Adult Homes "are not clinically appropriate settings for the significant number of persons with serious mental illness who reside in such settings, nor are they conducive to the rehabilitation or recovery of such persons."

64.    On or about October 1, 2012, Dr. Sederer issued a second Clinical Advisory that updated and amended the August 8, 2012, Clinical advisory.

65.    The Clinical Advisory of October 1, 2012, states that the Clinical Advisory of August 1, 2012, applied only to adult homes that meet the definition of "Transitional Adult Home."

## II.    GOVERNING LEGAL STANDARD

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[14]  As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255.

---

[14]    As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted].  As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).  However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(a),(c),(e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.[15]  Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).  Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant.  *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.).  What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1(b) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that

---

[15]     *Cusamano v. Sobek*, 604 F. Supp.2d 416, 426 & n.2 (N.D.N.Y. 209) (Suddaby, J.) (citing cases).

statement.[16]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 56.1(b).[17]  Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden.  *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

## III.   ANALYSIS

---

[16]    Among other things, Local Rule 56.1(b) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.  N.D.N.Y. L. R. 56.1(b).

[17]    *See*, *e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

A.       **Whether Plaintiff Has Standing**

"To establish standing to obtain prospective [injunctive or declaratory] relief, a plaintiff must show a likelihood that he will be injured in the future." *Carver v. City of New York*, 621 F.3d 221, 228 (2d Cir. 2010) (internal quotation marks omitted).

As to the nature of the injury required, "abstract injury is not enough . . . ." *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004) (internal quotation marks omitted).  Rather, the injury must be "concrete and particularized." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks and citations omitted).  Moreover, when the request is premised on an allegation that one has been injured in the past and is threatened by a repeat of that injury, a plaintiff must show "a sufficient likelihood that he will again be wronged in a similar way." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).

As to the requirement that the injury be *likely*, "allegations of possible future injury or even an objectively reasonable likelihood of future injury are insufficient to confer standing." *McMorris v. Carlos Lopez & Assocs., LLC*, 995 F.3d 295, 299-300 (2d Cir. 2021) (internal quotation marks omitted).  Rather, the future injury must be "certainly impending," or there must be "a substantial risk that the harm will occur."  *McMorris*, 995 F.3d at 300 (internal quotation marks omitted).  Simply stated, the future injury "must be both real and immediate, not conjectural or hypothetical."  *Shain*, 356 F.3d at 215 (internal quotation marks omitted).

Under the circumstances, to successfully oppose Respondent's motion for summary judgment on the issue of standing, Petitioner needs to set forth at least some admissible record evidence from which a reasonable jury could find as follows: (1) there exists a substantial risk that he will seek readmission to a Transitional Adult Home; (2) there exists a substantial risk that

he would be denied readmission under the Challenged Regulations; and (3) there exists a

substantial risk that either he would be denied a waiver of that denial under the Challenged

Regulations or the waiver would be delayed (temporarily excluding him from a Transitional

Adult Home).[18]

       With regard to the first fact (i.e., there exists a substantial risk that Petitioner will seek

readmission to a Transitional Adult Home), the Court finds that the following evidence suffices

to create at least a genuine dispute of material fact.  Petitioner suffers from schizophrenia.  (Dkt.

No. 243, Attach. 1, at ¶ 4.)  He was a resident of Oceanview (a *Transitional* Adult Home) from

2004 and 2014.  (Dkt. No. 243, Attach. 1, at ¶¶ 5, 6.)  In 2014, he moved out of Oceanview and

into supportive housing.  (*Id*. at ¶ 6.)  Over the next two years, he moved to at least three

different apartments.  (*Id.* at ¶ 7.)  But he moved out of each of those apartments because of

---

[18]    In support of his argument that any delay constitutes a sufficiently concrete injury in fact, Petitioner cites *Nutritional Health All. v. Shalala*, 144 F.3d 220, 227 n.14 (2d Cir. 1998).  (Dkt. No. 244, at 13 [attaching page "7" of Petitioner's Opp'n Mem. of Law].)  Respondent attempts to distinguish that case on the ground that the delay in that case lasted 540 days, not the "several days" the delay would last here.  (Dkt. No. 246, at 12 [attaching page "7" of Respondent's Reply Memo. of Law].)  However, the Court is not convinced by Respondent's argument.  In *Nutritional Health All*., the Second Circuit noted that the concrete injury began not *after* the expiration of the 540-day period but "as soon as" the plaintiff faced the delay.  *See Nutritional Health All*., 144 F.3d at 227, n.14 ("There is also no doubt that plaintiffs have standing to raise the prior restraint claim. The delay that they will face *as soon as they submit a proposed health claim* to the FDA constitutes a concrete injury in fact. For during the 540-day FDA review period the manufacturers and retailers will be prohibited from giving, and the consumers prevented from receiving, information allegedly protected by the First Amendment.").  In any event, district courts in the Second Circuit have found briefer delays to constitute an injury in fact.  *See, e.g., Gillett v. Zara USA, Inc.*, 20-CV-3734, 2022 WL 3285275, at *6 (S.D.N.Y. Aug. 10, 2022) ("Irrespective of the fact that Plaintiff ultimately received the entire sum of wages he was owed, this [seven-day] delay of payment, in and of itself, constitutes a concrete harm that suffices for purposes of Article III. . . .  That Defendants' delay was only a week or that the economic harm may amount to a relatively meager sum in absolute terms does not relegate Plaintiff's injury in fact beyond the bounds of Article III.").

conditions there such a bathroom fire, a cockroach infestation, a leaky ceiling, and open garbage. (*Id*. at ¶¶ 8, 9, 10, 14.)  In 2016, he tried to move back into Oceanview but was denied readmission.  (*Id*. at ¶ 15.)

In 2017, he was able to move back into Oceanview, from which he "hopes" to once again move out of and into independent housing.  (*Id*. at ¶¶ 17, 19.)  More specifically, since "immediately" after moving back into Oceanview in 2017, he has "want[ed]" to get his own apartment again (as he did when he moved out between 2014 and 2017).  (Dkt. No. 238, Attach. 31, at 71-72.)  Initially, he considered even moving to another Transitional Adult Home (such a Surf Manor or Mermaid Manor) because he "just felt [he] didn't want to be here [any] more." (*Id*. at 64-65, 76.)  But he rejected the idea, because he did not want to live with another man again.  (*Id.* at 65-66.)

After he moved back to Oceanview in 2017, he initially worked with the Jewish Board to find a vacant apartment.  (Id. at 71-72, 74.)  During that time, once a woman name Darlene (who "works with," but is not "affiliated with," the Jewish Board) showed him a place at Lincoln Terrace, not far away from his younger sister at Albany Projects. (Id. at 75.)  But he did not move there because his sister felt it was not safe.  (Id.)  As of December 2019, he was working with three people at Saint Joseph to find a vacant apartment (Mr. Hector, Ms. Katie, and Mr. Marc Price), with whom he meets "weekly" in Oceanview's lunchroom, usually before lunch.  (Id. at 72.)  But no one from Saint Joseph had shown him an apartment as of December 2019.  (Id. at 75-76.)  Despite this fact, on November 4, 2021, he moved out of Oceanview. (Dkt. No. 244, Attach. 2, at ¶ 4.) But he moved back into it the same day because he did not know the neighborhood, did not know anyone who lived around there, did not want a roommate, and was

"very unhappy" with the apartment.  (Id.)

Simply stated, setting aside the fact that Petitioner suffers from schizophrenia and that Oceanview is categorized by Respondent as being "transitional" in nature, the Court relies on the fact Petitioner has moved out of an apartment five times since 2014, he has tried to move back to Oceanview at least three times, and he hopes to once again move out of Oceanview Manor into independent housing.  Based on the admissible record evidence before the Court, at least a genuine dispute of material fact exists as to whether there exists a substantial risk that Petitioner will seek readmission to a Transitional Adult Home.

With regard to the second fact (i.e., that there exists a substantial risk that Petitioner would be denied readmission under the Challenged Regulations), the Court finds that the current record evidence suffices to create at least a genuine dispute of material fact on the issue (e.g., the fact Petitioner has moved out of an apartment five times since 2014, and has tried to move back to Oceanview at least three times, and the fact that in 2016 Petitioner tried to move back into Oceanview but was denied readmission).

Finally, with regard to the third fact (i.e., that there exists a substantial risk that either he would be denied a waiver of that denial under the Challenged Regulations or the waiver would be delayed), the Court finds that the current record evidence suffices to create at least a genuine dispute of material fact on the issue (including Respondent's acknowledgment that such a delay would last "several days" here).  (Dkt. No. 246, at 12 [attaching page "7" of Respondent's Reply Memo. of Law].)

For all of these reasons, the Court finds that at least a genuine dispute of material fact exists as to whether Plaintiff has standing.

**B.      Extent to Which Respondent's Evidence Is Admissible**

As stated above in Part I.B.2.b. of this Decision and Order, in opposing Respondent's

motion for summary judgment, Petitioner argues that Respondent's motion is not based on

admissible record evidence for two reasons: (1) Petitioner would be unfairly prejudiced if the

Court were to permit Respondent to rely on the opinion testimony of Dr. Lloyd Sederer, because

it constitutes expert testimony, and Dr. Sederer was not designated as an expert witness (unlike

Respondent's designated expert witnesses, Dr. Thomas Smith and Kevin Martone); and (2)

Petitioner would also be unfairly prejudiced if the Court were to permit Respondent to rely on

other evidence (i.e., the declarations of Heidi Hayes and Dr. Robert Myers, and factual findings

by a judge in another case to which Petitioner was not a party), because that evidence is not based

on personal knowledge, constitutes inadmissible hearsay (without an exception), is not relevant,

and/or constitutes (or is based on) undisclosed expert testimony.

As stated above in Part I.B.2.c. of this Decision and Order, in reply, Respondent argues

that his evidence is admissible for two reasons: (1) Dr. Sederer's testimony and exhibits are

admissible, because he is merely a fact witness who is testifying based on his own personal

knowledge as to issues raised by Petitioner himself (and the documents Dr. Sederer relies on

either were authored by him or are relevant for the non-hearsay purpose of showing that the

Regulations were sufficiently supported); and (2) Respondent's evidence is not inadmissible

hearsay, because Ms. Hayes' responsibilities require knowledge of the purposes of the

Challenged Regulations, the exhibits to the declaration of Dr. Myers are admissible business

records under Fed. R. Evid. 803(6), admissible public records under Fed. R. Evid. 803(8), and/or

admissible for non-hearsay purposes, and the decision of another judge is relied on not for its

factual findings but its legal opinion.

After carefully considering the matter, the Court finds that Respondent's proffered testimony should be disregarded to the extent that it exceeds the witnesses' personal knowledge,[19] is inadmissible hearsay (without an exception), is irrelevant, and/or is based on undisclosed expert testimony. The results of this finding are reflected in the above-stated Statement of Undisputed Material Facts on Respondent's motion for summary judgment and the above-stated Statement of Undisputed Facts on Petitioner's motion for summary judgment. *See, supra,* Parts I.C.2. and I.C.1. of this Decision and Order.

Turning to the thornier issue presented by the proffered testimony of Dr. Sederer, the Court begins by emphasizing that Respondent expressly relies on Dr. Sederer *not* as an expert witnesses but as a fact witness. (*See* Dkt. No. 246, at 13 [Respondent's Opp'n Memo. of Law, arguing, "Petitioner erroneously attacks the Declaration of Dr. Lloyd I. Sederer, M.D. . . . . as setting forth inadmissible expert witness testimony. Dr. Sederer is a fact witness who is testifying on his own personal knowledge as to issues raised by Petitioner himself"].)[20] More specifically,

---

[19]      *See, e.g.,* Fed. R. Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."); Fed. R. Evid. 701(a) (requiring that lay opinion testimony be "rationally based on the perception of the witness").

[20]      Of course, if Dr. Sederer had been designated by Respondent as an expert witness (and he had been found by the Court to use scientific methods to reach his conclusions), the lack of evidentiary support for his conclusions would go to the weight, not the admissibility, of his opinion. *See Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2022) ("Where an expert otherwise reliably utilizes scientific methods to reach a conclusion, lack of textual support may 'go to the weight, not the admissibility' of the expert's testimony."); *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043-44 (2d Cir. 1995) (finding that, where an expert "could not point to a single piece of medical literature that says glue fumes cause throat polyps," a dispute as to the "lack of textual authority for his opinion" went "to the weight, not the admissibility, of his testimony"); *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp.3d 396, 420

Respondent relies on Dr. Sederer as the author of a "clinical determination" that is (purportedly) based on the following materials: (1) a 1999 amicus brief from the American Psychiatric Association ("APA") in *Olmstead* stating its opinion regarding the community integration of individuals with disabilities; (2) a 2005 "Position Statement" of the APA regarding the "concept of recovery"; and (3) a 2007 report of OMH (authored by Dr. Sederer himself) assessing the State's public mental health system.  (*Id.* at 14 [citing Sederer Decl. ¶¶ 9-17].)

None of these materials expressly finds either the 25-percent threshold or 80-bed threshold to be appropriate.  (*See generally* Dkt. No. 238, Attach. 25-27 [Exs. B, C, and D to Sederer Decl.].)  *See also, supra,* Part I.C.1. of this Decision and Order, at ¶¶ 46, 48, 50, 51. Granted, based on the current record, a close question exists regarding whether Dr. Sederer's determination of those particular thresholds from the referenced materials (and his experience) was "based on scientific, technical, or other specialized knowledge" for purposes of Fed. R. Evid. 701(c).[21]  If the Court were to render such a finding at trial, it would preclude this testimony as that of an undisclosed expert.[22]  However, because the Court can conceive of a way that the

---

(S.D.N.Y. 2016) ("[A] lack of specific citation in [the expert's] report goes to the weight of her opinions, not their admissibility.").

[21]     *See* Fed. R. Evid. 701 ("If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.").

[22]     *See United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005) ("If the opinion rests 'in any way' upon scientific, technical, or other specialized knowledge, its admissibility must be determined by reference to Rule 702, not Rule 701.") (citing 4 *Weinstein's Federal Evidence* § 701.03[1] and Fed. R. Evid. 701, Advisory Committee Notes to 2000 Amendments); *see, e.g., Bank of China v. NBM LLC*, 359 F.3d at 182 (finding error in admission of evidence under Fed. R. Evid. 701 that was "not a product of [witness's] investigation" but rather "reflected [his] specialized knowledge").

opinion could "be presented in a form that would be admissible in evidence" pursuant to Fed. R.

Civ. P. 56(c)(2), the Court will not preclude that testimony in its entirety at this stage of the

action.

      As a result, the Court finds that Dr. Sederer's opinion testimony regarding such matters as

the 25-percent and 80-bed thresholds is admissible to the extent that it is "rationally based on

[his] perception" of the above-referenced materials (and/or his experience) for purposes of Fed.

R. Evid. 701(a).[23]  Again, the results of this finding are reflected in the above-stated Statement of

Undisputed Material Facts on Respondent's motion for summary judgment and the above-stated

Statement of Undisputed Facts on Petitioner's motion for summary judgment.  *See, supra,* Parts

I.C.2. and I.C.1. of this Decision and Order.

      **C.**    **Effect of Third Department's Decision on Current Action**

      After carefully considering the matter, the Court finds that, rather than having preclusive

effect on the current action, the Third Department's decision in *Oceanview Home for Adults, Inc.*

*v. Zucker, et al.*, No. CV-22-1940, 2023 WL 3235674 (N.Y. App. Div., 3d Dept., May 4, 2023),

constitutes only persuasive authority regarding Petitioner's FHA claim in the current action

(albeit persuasive authority that is entitled to "great respect").  *Indus. Consultants, Inc. v. H. S.*

*Equities, Inc.*, 646 F.2d 746, 749 (2d Cir. 1981) (internal quotation marks omitted).

      "The doctrine of res judicata, or claim preclusion, holds that 'a final judgment on the

merits of an action precludes the parties or their privies from relitigating issues that were or could

---

[23]     The Court notes that this rational-basis requirement "is the familiar requirement of
first-hand knowledge or observation." *United States v. Rea*, 958 F.2d 1206, 1215 (2d Cir.1992)
(internal quotation marks omitted) (quoting Fed. R. Evid. 701 advisory committee notes on the
1972 proposed rules), *accord, United States v. Garcia*, 291 F.3d 127, 140 (2d Cir. 2002).

have been raised in that action.'" *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 284 (2d Cir.2000). Thus, res judicata "bars later litigation if an earlier decision was (1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a case involving the same parties or their privies, and (4) involving the same cause of action." *Esquire Trade & Finance, Inc. v. CBQ, Inc.*, 562 F.3d 516, 520 (2d Cir. 2009).

Of these four elements, the one placed most at issue here appears to be the third one (i.e., whether the earlier decision was in a case involving the same parties or their privies).   Because the Court finds that Oceanview and its three co-plaintiffs in the case before Justice Walsh were not the same as, or in privity with, Plaintiff in this case, the Court finds the doctrine of res judicata to not apply.

"Collateral estoppel, or issue preclusion, bars the relitigation of issues actually litigated and decided in the prior proceeding, as long as that determination was essential to that judgment." *Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*, 56 F.3d 359, 368 (2d Cir.1995) [citations omitted]. "Four elements must be met for collateral estoppel to apply: (1) the issues of both proceedings must be identical, (2) the relevant issues were actually litigated and decided in the prior proceeding, (3) there must have been full and fair opportunity for the litigation of the issues in the prior proceeding, and (4) the issues were necessary to support a valid and final judgment on the merits." *Central Hudson*, 56 F.3d at 368 [citations and internal quotation marks omitted].  Finally, of course, the later litigation must be "between the same parties or involves nonparties that are subject to the binding effect or benefit of the first action." Wright & Miller, 18 *Fed. Prac. & Proc.* § 4416, "Issue Preclusion in General" (3d ed.); *see also Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 288 (2d Cir. 2002) (noting that collateral

estoppel "prevents parties or their privies from relitigating in a subsequent action an issue of fact or law that was fully and fairly litigated in a prior proceeding"); *Burgos v. Hopkins*, 14 F.3d 787, 792 (2d Cir. 1994) ("Under New York law, the doctrine of collateral estoppel precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party or those in privity, whether or not the tribunals or causes of action are the same.") (internal quotation marks omitted); *United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 718-19 (2d Cir. 1993) ("[The] fundamental notion [of collateral estoppel] is that an issue of law or fact actually litigated and decided by a court of competent jurisdiction in a prior action may not be relitigated in a subsequent suit between the same parties or their privies."); *see, e.g., Sherman v. Kirshman*, 369 F.2d 886, 889 (2d Cir. 1966) ("We hold there is no [prior] judgment binding on these appellants and no 'collateral estoppel.'").

Again, of these five elements, the one placed most at issue here appears to be the fifth one (i.e., whether the earlier decision was in a case involving the same parties or their privies). Because the Court finds that Oceanview and its three co-plaintiffs in the case before Justice Walsh were not the same as, or in privity with, Plaintiff in this case, the Court finds the doctrine of collateral estoppel to not apply.

For all of these reasons, the Court finds that, rather than having preclusive effect, the decision of the Appellate Division constitutes only persuasive authority on the current action (albeit persuasive authority that is entitled to "great respect"). *Indus. Consultants, Inc.,* 646 F.2d at 749 (internal quotation marks omitted).  The Court notes that the Appellate Division decided an issue of *federal* law, not state law (i.e., whether the Challenged Regulations violate the FHA). *Cf. Myles Salt Co. v. Bd. of Com'rs of Iberia & St. Mary Drainage Dist.*, 239 U.S. 478, 484

(1916) ("It is true the law of the state as written is not attacked, but the law as administered and justified by the supreme court of the state is attacked, and it is asserted to be a violation of the Constitution of the United States. The question presented is Federal."); *Siler et al. v. Louisville & Nashville Railroad Co.*, 213 U.S. 175, 191 (1909) ("This is, of course, a local or state question. The federal questions as to the invalidity of the state statute, because, as alleged, it was in violation of the federal Constitution, gave the Circuit Court jurisdiction . . . .").

> **D.    Whether Either Party Is Entitled to Judgment as a Matter of Law on Petitioner's FHA Claim**

> **1.    Whether the FHA Expressly Preempts the Challenged Regulations**

The FHA contains a preemption clause providing that "[a]ny law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under this subchapter shall to that extent be invalid."  42 U.S.C. § 3615.  As stated earlier, in support of his request for summary judgment on his Third Claim (under the FHA), Petitioner argues that the Challenged Regulations are invalid under the FHA's express preemption provision for four reasons.  *See, supra,* Part I.b.1.a. of this Decision and Order.  After carefully considering the matter, the Court rejects these reasons for the reasons stated by Respondent in his opposition memorandum of law (including the fact that, under the proper legal standard governing an FHA claim, the Challenged Regulation are not expressly preempted by the FHA). *See, supra,* Part I.B.1.b. of this Decision and Order.

> **2.    Proper Legal Standard Governing Petitioner's FHA Claim**

The FHA makes it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of . . . that buyer or

renter." 42 U.S.C. § 3604(f)(1)(A). Where a statute or regulation "expressly treats someone

protected by the FHAA in a different manner than others"—i.e., is "facially discriminatory"—

courts evaluate the regulation under the rubric of intentional discrimination (or disparate

treatment), and a prima facie case is considered established without a need for additional proof of

motive or intent. *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1500-01 (10th Cir. 1995) (citing

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers v. Johnson Controls, Inc.*, 499

U.S. 187, 199 (1991)); *Rehabilitation Support Servs. Inc. v. City of Albany*, 14-CV-0499, 2017

WL 3251597, at *4 (N.D.N.Y. July 28, 2017) (Kahn, J.).

　　Here, the Court agrees with the Third Department (and New York State Supreme Court

Justice Margaret Walsh) that "the regulations at issue are discriminatory on their face –

regardless of their remedial purpose – insofar as the admissions cap applies solely to individuals

with serious mental illness." *Oceanview Home for Adults, Inc. v. Zucker, et al.*, No. CV-22-

1940, 2023 WL 3235674, at *4 (N.Y. App. Div., 3d Dept., May 4, 2023) (agreeing with NYS

Supreme Court Justice Margaret Walsh on the issue).　The Court agrees also that "[t]he further

question is the appropriate standard to apply in gauging the propriety of the regulations under the

FHA in light of the facial discrimination." *Oceanview*, 2023 WL 3235674, at *4.

　　Respondent persuasively argues that, generally, once it is determined that a regulation is

facially discriminatory, courts then assess the government's justifications for the regulation. *See*

*Sierra v. City of New York*, 552 F. Supp. 2d 428, 430 (S.D.N.Y. 2008) (describing approaches

taken by federal circuit courts that have considered the issue, i.e., the Sixth, Eighth, Ninth, and

Tenth Circuits).　As for the level of the Court's scrutiny of these justifications, among the four

Courts of Appeals that have decided the issue, one (the Eighth Circuit) has applied rational-basis

scrutiny, and the other three have applied a "more searching" level of scrutiny (one of which expressly doing so based on the language of the exceptions stated in the FHA). *Compare Familystyle of St. Paul, Inc. v. City of St. Paul*, 923 F.2d 91, 94 (8th Cir. 1991) (applying rational-basis scrutiny because the handicapped are not a "suspect class") *and Oxford House–C v. City of St. Louis*, 77 F.3d 249, 252 (8th Cir. 1996) (applying rational-basis scrutiny) *with Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1503-04 (10th Cir. 1995) ("The proper approach is to look to the language of the FHAA itself, and to the manner in which analogous provisions of Title VII have been interpreted, in order to determine what justifications are available to sustain intentional discrimination against the handicapped.") *with Larkin v. Mich. Dep't of Social Servs.*, 89 F.3d 285, 290-91 (6th Cir. 1996) (appearing to reject the Eighth Circuit approach and adopt the Tenth Circuit approach by requiring that the statute "be tailored to the particular needs of the disabled who will reside in the house") *and Community House, Inc. v. City of Boise,* 490 F.3d 1041, 1050 (9th Cir. 2007) (expressly rejecting the Eighth Circuit's rational-basis test and following the "more searching" approach of the Tenth and Sixth Circuits by requiring a defendant to show either "(1) that the restriction benefits the protected class or (2) that it responds to legitimate safety concerns raised by the individuals affected, rather than being based on stereotypes").

However, Petitioner urges the Court to essentially follow the approach used by the Tenth and Sixth Circuits, arguing that the approaches used by the Eighth and Ninth Circuits stem from a 1974 Eighth Circuit decision that erroneously grafted a constitutional standard onto the FHA. *See United States v. City of Black Jack, Missouri*, 508 F.2d 1179, 1185, n.4 (8th Cir. 1974) (concluding, without further explanation, that, "[e]ven though this case is based on a federal

statute, rather than on the Fourteenth Amendment, we believe that, once the United States established a prima facie case of racial discrimination, it became proper to apply the compelling governmental interest requirement of the equal protection cases").  (Dkt. No. 237, at 17-18.) Instead, Petitioner argues, a facially discriminatory state statute may escape invalidation by the FHA's express preemption provision only if Respondent meets his burden of demonstrating that the statute fits within the statutory exception for "a direct threat to the health or safety of other individuals . . ." under 42 U.S.C. § 3604(f)(9).  (Dkt. No. 237, at 15-16.)

In the absence of a Second Circuit decision on the issue, three federal district courts in New York State (the Northern, Eastern and Southern Districts) have applied heightened scrutiny. *See Rehabilitation Support Servs*., 2017 WL 3251597, at *4 ("If the plaintiff can make out a prima facie case of facial discrimination, the Court, applying heightened scrutiny, proceeds to analyze the government's justifications for the statute and asks whether the statute benefits the protected class or responds to legitimate safety concerns."); *Human Resource Research & Management Group, Inc. v. County of Suffolk*, 687 F. Supp. 2d 237, 255 (E.D.N.Y. 2010) ("While there currently exists a split among the circuits regarding 'the appropriate standard for evaluating the validity of state statutes that are facially discriminatory under the FHA, . . . the Court concludes, as discussed below, that heightened scrutiny applies to FHA disparate treatment claims.") (internal quotation marks and citation omitted); *Sierra*, 552 F. Supp. 2d at 431 ("But where, as in the case of the FHA, Congress has promulgated a more specific prohibition addressed to a more specific protected class—here, families with children—a more heightened scrutiny is appropriate in order to assure that Congress's specific mandate is not thwarted.").

After carefully considering the matter, the Court will follow the analysis used in the three

above-cited district court decisions (for the reasons stated therein) and apply heightened scrutiny: Respondent must show that the Challenge Regulations further a legitimate state interest, and are narrowly tailored to satisfy that interest.

This does not end the Court's analysis, however, because a disagreement also exists about "the formulation of narrow tailoring that applies." *See Oceanview Home for Adults, Inc. v. Zucker, et al.*, No. CV-22-1940, 2023 WL 3235674, at *5 (N.Y. App. Div., 3d Dept., May 4, 2023). Some judges (including two Justices of the New York State Supreme Court for the County of Albany) have used a "least restrictive alternative" standard as the form of "narrow tailoring" that applies. *See, e.g., Sierra*, 552 F. Supp. 2d at 431 (stating that, pursuant to the governing standard, "the defendant must prove [1] that its actions furthered, in theory and in practice, a legitimate, bona fide governmental interest and [2] that no alternative would serve that interest with less discriminatory effect") (internal quotation marks omitted); *accord, Human Resource Research & Management Group*, 687 F. Supp. 2d at 255, 267 ("[T]he Court concludes that defendant has failed to proffer sufficient evidence to justify any legitimate governmental interests furthered by S.C.C. § 450 and that defendant also has failed to proffer sufficient evidence to show that the law is the least discriminatory means of furthering those interests."); *Matter of Oceanview Home for Adults, Inc. v. Zucker, et al.*, Index No. 06012-16, Decision and Order, at 30-31 (N.Y. Sup. Ct., Albany Cnty. Aug. 27, 2018) (Connolly, J.) (requiring that the statute have no less-discriminatory alternative) (attached as Dkt. No. 243, Attach. 24, at 32-33 [Ex. V to Malone Decl.]), *accord, Matter of Oceanview Home for Adults, Inc. v. Zucker, et al.*, Index No. 906012-16, Decision/Order/Judgment, at 70 (N.Y. Sup. Ct., Albany Cnty. Oct. 6, 2022) (Walsh J.) (attached as Dkt. No. 258, Attach. 1).

61

However, other judges, including those of the Third Department, have rejected this "least restrictive alternative standard," and adopted a "less onerous" form of "narrow tailoring" that "does not require a showing that the challenged regulations are the least restrictive means of implementing the goal of integration."  *See Oceanview*, 2023 WL 3235674, at *4-5 (finding that "the appropriate standard to apply in gauging the propriety of the regulations under the FHA in light of the facial discrimination" was not the "least restrictive alternative standard" used by Justice Walsh, but the "narrowly tailored" standard embraced by the Sixth, Ninth and Tenth Circuits, which is "less onerous" than the standard used by Justice Walsh, and "does not require a showing that the challenged regulations are the least restrictive means of implementing the goal of integration"); *cf. Rehabilitation Support Servs.*, 2017 WL 3251597, at *4 (asking merely "whether the statute benefits the protected class or responds to legitimate safety concerns").

The Court agrees with the above-described aspect of the Third Department's decision, and finds that a "less onerous" form of "narrow tailoring" both exists[24] and governs here.  *See Bischoff v. Brittain*, 183 F. Supp.3d 1080, 1090-91 (E.D. Cal. 2016) ("At hearing, plaintiff argued there is no practical difference between the two standards, because narrow tailoring is necessary to show the policy in fact benefits the protected class and is not pretextual under the *Community House* standard. . . .  Having carefully considered the parties' positions and the relevant opinions, the court finds *Community House* governs this action and implicitly requires

_____

[24]     For example, the Court notes that, in certain contexts, both strict scrutiny and intermediate scrutiny (which are each forms of "heightened scrutiny") may require forms of "narrow tailoring."  *See United States v. Laurent*, 861 F. Supp.2d 71, 99 (E.D.N.Y. 2011) ("In the First Amendment context, intermediate scrutiny also requires that the statute be 'narrowly tailored.' . . . 'Narrow tailoring' in the context of First Amendment intermediate scrutiny does not require a perfect fit between the regulation and the government interest at stake.").

heightened tailoring, but does not require that defendants' policy be the least restrictive means of achieving the allowed interests."); *see, e.g., Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1503-04 (10th Cir. 1995) ("[R]estrictions that are narrowly tailored to the particular individuals affected could be acceptable under the FHAA if the benefit to the handicapped in their housing opportunities clearly outweigh whatever burden may result to them.").

  As a result, the Court will apply a form of "narrow tailoring" that "does not require a showing that the challenged regulations are the least restrictive means of implementing the goal of integration." More specifically, the Court will apply the standard recommended by the United States Department of Justice in its Statement of Interest in this action (with leave of the Court): "[a] housing restriction that facially discriminates against people with disabilities will pass muster under the FHA upon a showing '(1) that the restriction benefits the protected class or (2) that it responds to legitimate safety concerns raised by the individuals affected[,] rather than being based on stereotypes.'" (Dkt. No. 248, at 12-13 [quoting and/or citing decisions from the Sixth, Ninth and Tenth Circuits].)

### 3. Application of Proper Legal Standard

  For the sake of argument (and brevity), the Court will assume that, based on the current record, no genuine dispute of material fact exists regarding whether the Challenged Regulations either benefit the protected class or respond to legitimate safety concerns raised by the individuals affected (rather than being based on stereotypes). More specifically, the Court will assume they do so by implementing the integration mandate of *Olmstead*,[25] and/or by limiting the

---

[25] The Court notes that it agrees with the Third Department that the integration mandate of Title II of the ADA applies to TAHs as "public entities" (even though they are privately owned and operated). *Oceanview Home for Adults, Inc. v. Zucker, et al.*, No. CV-22-1940, 2023 WL

admission of new residents with a serious mental illness into transitional adult homes, in furtherance of the objectives of the *O'Toole* settlement.

The problem is that, even if so, the problem of narrow tailoring remains. With all due respect, the Court has trouble agreeing with the Third Department on this issue for two reasons. First, Respondent has not persuaded the Court that the undisputed (and disputed) material facts on which the Third Department based its decision with regard to the FHA claim pending before it are the same as the undisputed (and disputed) material facts on which this Court must base its decision with regard to the FHA claim pending before it.[26] Second, even if Respondent had so persuaded the Court, the Court remains skeptical as to whether no reasonable jury could find for Petitioner on those facts.

Simply stated, based on the current record, the Court finds that a genuine dispute of material fact exists regarding whether the benefits of the Challenged Regulations to those with SMI in their housing opportunities *clearly outweigh* whatever burdens may result to them. *See, e.g., Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1503-04 (10th Cir. 1995) ("[R]estrictions that are narrowly tailored to the particular individuals affected could be acceptable under the FHAA if the benefit to the handicapped in their housing opportunities ***clearly outweigh*** whatever burden may result to them.") (emphasis added). For example, based on the current record, it is for a jury to decide how much weight (if any) to give the testimony of Dr. Lloyd Lederer in determining whether adequate support exists for the 25-percent and 80-bed thresholds (as opposed to some

---

3235674, at *5-6 (N.Y. App. Div., 3d Dept., May 4, 2023).

[26]     The Court notes that, not only do the expert witnesses in both actions appear to somewhat differ, so do the legal standards governing the admissibility of expert testimony.

higher thresholds).  *See, supra,* Part I.C.1. of this Decision and Order, at ¶¶ 22, 26, 28, 29, 31, 32, 43-51; *see also, supra,* Part III.B. of this Decision and Order.  If those thresholds lack adequate support, a reasonable jury may find the Challenged Regulations are not narrowly tailored.  Similarly, based on the current record, it is for a jury to decide how much weight (if any) to give the testimony of Petitioner's expert, Dr. Lisa Dixon, in determining whether the Challenged Regulation's definition of SMI is too broad (and thus not narrowly tailored).  *See, supra,* Part I.C.1. of this Decision and Order, at ¶¶ 21, 52-57.  Finally, based on the current record, it is for a jury to decide whether the benefits of the Challenged Regulations' use of a waiver program (as opposed to, say, an amendment of the Challenged Regulations that does not deny re-admission in the first place) clearly outweigh the burdens that may result from it (including the several-day delay in re-admission).  *See, supra,* Part I.C.2. of this Decision and Order, at ¶ 30 (asserting that "in the majority of cases DOH has granted the waiver within 4.75 days").  (*See also* Dkt. No. 246, at 12 [attaching page "7" of Respondent's Reply Memo. of Law, acknowledging "several day[]" delay].)

For all of these reasons, the parties' motions for summary judgment are denied with regard to Petitioner's FHA claim.

**E.    Whether Either Party Is Entitled to Judgment as a Matter of Law on Petitioner's Article 78 Claim**

After carefully considering the matter, the Court answers this question in the negative, largely based on the record evidence referenced in the relevant portions of each party's opposition memorandum of law.  (*See generally* Dkt. No. 243, at 25-27, 30-35; Dkt. No. 244, at 38-40.)  More specifically, based on the current record, the Court finds that a genuine dispute of

material fact exists as to whether Respondent has promulgated the Challenged Regulations in a manner that is arbitrary, capricious, and irrational by, for example, (a) lacking scientific, empirical or evidence-based support for the 25-percent threshold and 80-bed threshold, and (b) categorizing all persons with a mental illness alike without regard to their individual circumstances.  As stated above at the end of Part III.D.3. of this Decision and Order, these are issues for a jury to decide.[27]

For all of these reasons, the parties' motions for summary judgment are denied with regard to Petitioner's Article 78 claim.

**ACCORDINGLY**, it is

**ORDERED** that Petitioner's motion for summary judgment (Dkt. No. 237) is **DENIED**; and it is further

**ORDERED** that Respondent's motion for summary judgment (Dkt. No. 238) is **DENIED**; and it is further

**ORDERED** that a pretrial conference shall be scheduled in this action, at which counsel shall appear with settlement authority.

Dated: June 30, 2023
      Syracuse, New York

Glenn T. Suddaby
U.S. District Judge

---

[27]    Before trial, the Court will (with the assistance of briefing by counsel) explore the paradoxical nature of any attempt by Respondent to show that the Challenged Regulations possess scientific support for purposes of Petitioner's Article 78 claim through an opinion of Dr. Sederer that is not based on scientific knowledge for purposes of Fed. R. Evid. 701(c).